EMERY EUGENE BAILEY V. AMERICAN GENERAL
INSURANCE COMPANY

No. A-4785. Decided May 11, 1955.
Rehearing overruled June 8, 1955.
(279 S.W. 2d Series 315)

*Hill, Brown, Kronzer & Abraham, John L. Hill* and *W. James Kronzer,* all of Houston, for petitioner.

The Court of Civil Appeals erred in holding that petitioner's incapacity and disability did not result from an injury or personal injury as that term is defined by the workmen's compensation statute. Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Texas 239, 54 S.W. 944; Houston Elec. Co. v. Dorsett, 145 Texas 95, 194 S.W. 546.

*Vinson, Elkins, Weems & Searls* and *L. J. Clayton,* of Houston, for respondent.

MR. JUSTICE SMITH delivered the opinion of the Court.

This is a workmen's compensation suit. The case was submitted to a jury upon special issues, resulting in a verdict and judgment for petitioner for 50% partial disability. That judgment has been reversed and rendered by the Court of Civil Appeals. 268 S.W. 2d 528.

The petitioner and another workman, while in the course of their employment, were at opposite ends of a movable scaffold which was supported by cables from the roof of a building. The end of the scaffold opposite that on which petitioner stood gave way, and the other workman fell to his death on the roof of another building eight stories below. Petitioner saw his co-worker strike the roof below and thought he himself was about to fall and be killed, but was caught in the cable in such manner that he did not fall. The wind was blowing and the scaffold swung away from the wall, but as it swung back petitioner was released and was able to jump to the roof of another building which was about the same height as the scaffold. Petitioner suffered a bruise on his leg and cable burn, but such injuries were minor in nature, were completely healed within a short time after the incident, and did not cause or contribute to any disability on his part. Petitioner contends that the traumatic effect of the accident upon his nervous system directly resulted in a disabling neurosis, termed an "anxiety reaction" or "anxiety state" by both medical experts heard in the trial court, which has rendered it impossible for claimant to engage in the field of employment for which he is trained and upon which he depends for his livelihood. The majority of the Court of Civil Appeals sustained respondent's contention that the petitioner's disability is not due to an injury within the meaning of the statutory definition of injury. With this conclusion we do not agree.

The question here is: Has Emery Eugene Bailey suffered damage or harm to the physical structure of his body? Petitioner, as a young man, became an iron worker, took an apprenticeship, graduated fairly promptly to a journeyman's scale in journeyman's work, and the evidence shows that at all times prior to the date of this unfortunate accident petitioner was able to perform capably duties as an iron worker; that he was considered one of the better iron workers and that he was not suffering from any nervous disorder and was as steady as the average individual. The testimony in the trial shows that when petitioner tried to resume his work as an iron worker he was

tense, nervous, jumpy and affected with an overpowering terror and fear of impending disaster. His faculties for alertness, concentration and ability to think and act under the normal stress and strain of his employment have been definitely impaired to such an extent that he is no longer qualified as a structural steel and iron worker. He has become moody and irritable; he has periods of "blanking out"; he is unable to rest at the end of a working day and is affected with constant, recurring nightmares evidenced by quivering, jumping and crying out in his sleep. The record shows that on one occasion petitioner "froze," literally paralyzed, while attempting to work at a considerable height following his accident. Tests performed by the two neurosurgeons prior to the trial showed that petitioner's blood pressure was 140/92; that he was hypersensitive to pain, and that there was tremor of his closed eyelids and that his reflexes were underactive.

We find from excerpts of the testimony that Dr. Brown testified, in response to suestions, as follows:

"Q. 'Anxiety state' is that something a neurosurgeon can diagnose, just like a fractured arm?

"A. Yes.

"Q. State whether or not that is a term by which a neurosurgeon, a medical terminology by which a neurosurgeon describes harm to the function of the nervous system.

"A. Yes. The neurosurgeon, or the neurologist, or the psychiatrist would use the same terms in describing disturbance of function to the nervous system.

"Q. State whether or not, in your opinion, based upon your first examination and the findings which you made, you had any opinion then as to whether or not there had been a disturbance, interference, or harm to the function of Mr. Bailey's nervous system as a result of the accident or accidental event which he described as having occurred on October 31st.

"A. Yes. I would think there was definitely a great psychic trauma to the individual and that he developed this nervous condition as a result of it. It was really a precipitation rather than a cause, but he probably wouldn't have developed it without this traumatic experience.

"Q. You use this word 'trauma', you say 'psychic trauma' and you say 'traumatic experience'. What do you mean by 'trauma' or 'traumatic'?

"A. I mean by that injury or damage to the individual so that he is not functioning properly. In this particular instance, it is not an organic damage, but what we call a functional damage and might be likened to a short circuit. The wires are still there, but they have shorted out, and he is not functioning as he should.

"Q. Now, Doctor, so I can be sure the record is clear, is it your professional opinion, based upon a reasonable degree of medical certainty, that this condition has been brought about or produced by this event or occurrence of October 31st that occurred on that scaffold that he described?

"A. Yes.

"Q. What have been your primary suggestions, Doctor?

"A. I have recommended that he do as much work as he is capable of doing, that he get as much recreation as is possible for him, and that he get adequate rest.

\* \* \*

"A. I have given him drugs in an attempt to control his nervousness, to see he gets enough rest, and to do away with his depression, which I learned about after his original visit.

"Q. Doctor, I would like to get your ideas on this question of nervous injury or injury to the nervous system, psychic trauma or whatever you want to call it, where it affects a man's nervous disposition, his degree of tenseness or non-tenseness, his degree of apprehension or non-apprehension. Is that just as well accepted and just as well known in the medical literature of this country as any other type of direct injury, whether it be a fractured skull, or a broken back, or anything else?

"A. Yes, I would say so.

"Q. Is that type of thing calculated to be just as real and disabling, this damage to the nervous system, as damage to any other part of the usable body of a man?

"A. Yes.

"Q. Is there any reason in the world why Mr. Bailey could not have gone along, assuming for the moment he was a perfectly normal man, that he suffered a most serious nervous disorder, that he was just like any other normal individual, no hero, but not a 'scary-cat' either, a normal man functioning normal, like normal things, reacted normally to situations, is there any reason without this episode that occurred on October

31st he could not have looked forward in all probability to continuing with that same type nervous set-up as before?

"A. I don't think so.

"Q. Has it been your experience and have you seen both in the service and out, damage or harm, or interference with the function of the nervous system, brought about by an episode similar to the one described here without there actually being any physical, lasting damage, such as broken bones and the like?

"A. Yes.

"Q. Is that disabling?

"A. Yes, Definitely."

No issue is raised concerning the causal relationship between the accident and the psychic and psychosomatic injury described above. All parties agree that the experience of seeing a fellow workman plunge to his death and narrowly escape death himself, directly produced the injury which has disabled this petitioner.

■ In determining the meaning of the definition of injury contained in the Workmen's Compensation Statute the Court should be guided by the often announced rule of construction in reference to this statute, that since it is "remedial," "if there be any reasonable doubt which may arise in a particular case as to the right of the injured employee to compensation, same should be solved in favor of such right." Jones v. Texas Indemnity Ins. Co., Texas Civ. App., 1949, 223 S.W. 2d 286, writ refused.

■ The following definition is contained in Section 1, Article 8309, Subsection 5, Workmen's Compensation Law: "The terms 'injury' or 'personal injury' shall be construed to mean *damage* or *harm* to the *physical structure of the body* and such diseases or infection as naturally result therefrom." (Emphasis added). There are two ways to construe the word "physical structure of the body." The respondent considers "physical structure" to imply a grouping of individual, but connected, parts * * as bones, tissues, nerves, blood vessels, etc. Then, so the reasoning proceds, the statutory definition requires a lesion or actual gross alteration of one or more of these individual parts in order to qualify as an "injury." We do not agree with this interpretation. A liberal construction of the statute as outlined below, is the more desirable and proper interpretation.

The phrase "physical structure of the body," as it is used in the statue, must refer to the *entire* body, not simply to the skeletal structure or to the circulatory system or to the digestive system. It refers to the whole, to the complex of perfectly integrated and interdependent bones, tissues and organs which function together by means of electrical, chemical and mechanical processes in a living, breathing fuctioning individual. To determine what is meant by "physical structure of the body," the structure should be considered that of a living person—not as a static, inanimate thing.

Now the question arises, has there been "damage or harm" to the "physical structure" of claimant's body? Recall the description of plaintiff's symptoms set out earlier. What was the verdict or estimation of the various witnesses concerning these symptoms? Mr. Kirk, claimant's foreman or pusher, said, "he is just out of luck." Dr. Brown stated that plaintiff had suffered a severe "psychic trauma" and by that he meant "injury or damage to the individual so that he is not functioning properly." In answer to a question by plaintiff's attorney, Dr. Brown affirmed that such an injury was "calculated to be just as real and disabling, * * *, as damage to any other part of the usable body of a man." (Emphasis added).

The substance of all the testimony shows agreement that plaintiff's body no longer functions properly. Now, can we say that, as a matter of law, even though a "physical structure" no longer functions properly, it has suffered no "harm"? What meaning can the word "harm" to the body have if not that, as a result of the event or condition in question, the body has ceased to function properly? "Harm" with reference to a living, active structure—as the body is—in fact means essentially that the structure no longer functions as it should. It is a natural construction of the word "harm" with reference to the "physical structure" of a living person, to look to the effect of the event or condition in question upon the effective functioning of that structure.

We feel that it is not without significance that the words "damage or harm" were used by the Legislature in the definition of injury. We cannot assume that either the word "damage" or "harm" is extraneous. Some difference must have been intended. The ordinary as well as legal connotation of "harm" is that it is of broader import than "damage." Damage embraces direct physical injury to a cell, tissue, organ or organ system; "harm" to the physical structure of the body embraces also im-

pairment of use or control of physical structures, directly caused by the accident. This interference with use or control in an organism whose good health depends upon unified action and balanced synthesis can be productive of the same disabling signs and symptoms as direct physical injury to the cells, tissues, organs or organ systems. This conclusion is supported by the medical tetimony in this case.

The definition construed here was part of a revision of the Workmen's Compensation Act enacted in 1917. The last section of that legislation reads as follows: *"The law as it now stands being wholly inadequate* to protect the rights of industrial employees who may be injured in industrial accidents and the beneficiaries of such employees who may be killed in such accidents creates an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days be suspended, and the same is hereby suspended, and this Act shall take effect from and after its passage, and it is so enacted." (Emphasis added). Acts, 35th Leg., Reg. Sess., 1917, Ch. 103, p. 293. The Act was passed and became law on March 28, 1917. Such an express declaration of an intention to *extend* available protection and coverage beyond that available under pre-existing law seems directly contrary to the restrictive intention imputed to the lawmakers by the respondent.

The Court of Appeals in Louisiana, faced with a compensation case involving a nervous disorder arising out of an accident from which no demonstrable organic pathology resulted, quoted the following language from Schneider's Workmen's Compensation Law with approval and awarded compensation: " 'Even though an accident may not produce an anatomical pathology, nevertheless if the workman does in fact become disabled as a result of that accident, the injury is compensable, although such disability may be the result of hysteria—and may be traceable to a mental condition and not a physical disorder'." Peavy v. Mansfield Hardwood Lumber Co., La. Court of Appeals, 1949, 40 So. 2d 505, 508. The definition of injury in the Louisiana Compensation Law is as follows:

" 'Injury' and 'Personal Injuries' includes only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted." Louisiana Revised Statutes of 1950, Workmen's Compensation, Ch. 10, Sec. 1021, (7), p. 358.

In other words, despite a statutory definition more restrictive on its face than that contained in the Texas Act, a result has been reached in Louisiana in accord with the one here.

Looking to other jurisdictions, as well as to the prior rulings in our own courts, it seems that in rejecting the dichotomy between "mind" and "body" for the purpose of this decision, we do not depart from the well established trend of decisions, both in Workmen's Compensation and ordinary negligence litigation.

In Hood v. Texas Indemnity Ins. Co., 146 Texas 522, 209 S.W. 2d 345, 348, this Court ruled that workmen's compensation was properly awarded for disability resulting from a nervous disorder. In the Hood case, the Court said: "This man cannot use his physical powers." In the present case, the petitioner is incapacitated to do physical labor for the reason that he has sustained an injury which renders him incapable of using and controlling his physical structure. In the Hood case, the Court further said: "That incapacity is not simulated." In the present case petitioner's incapacity is not simulated. We cannot agree that the Legislature intended to say that a claimant such as the one in the Hood case was entitled to compensation, but that a claimant such as petitioner would be excluded. The definition of injury contained in the statute does not, in terms or by implication, exclude an injury causally connected with the employment. In the Hood case, the claimant entirely recovered from the physical injury in four weeks. In our case the evidence shows that the disorder to petitioner's nervous system persists as a serious disability. His incapacity, in our opinion, is even more real than that of the claimant in the Hood case. Of course, it is true that Hood had suffered an injury to his leg, and that his nervous disorder was said to have arisen out of that leg injury. Conceding this distinction, however, and looking to the purpose announced by the Legislature, as above set out, we cannot agree that the holding in the Hood case precludes recovery of compensation by the petitioner in the present case. We think the distinction attempted to be drawn by the Court of Civil Appeals is one without a difference.

In Charon's Case, 321 Mass. 694, 75 N.E. 2d 511, and Burlington Mills Corp., Blue Ridge Rayon Mills Division v. Hagood, 177 Va. 204, 13 S.E. 2d 291, workmen's compensation was allowed for physical incapacity due to nervous disorder in the absence of any organic injury. The language of these last opinions shows acceptance by other courts of substantially the same re-

lation between nervous disorder and physical structure as the one announced here.

The respondent relies upon the case of Bekelski v. O. F. Neal Company, 141 Neb. 657, 4 N.W. 2d 741. The dissent in the Bekelski case took substantially the same position as the present opinion. Although no recovery was allowed in that case, the dissent was expressly approved in the case of Roberts v. Dredge Fund, 71 Idaho 380, 232 Pac. 2d 975, and compensation awarded. The statutes of both Nebraska (Comp. St. 1929 § 48-152) and Idaho (I.C. § 72-201) require "violence to the physical structure of the body." The only possible distinction between the Dredge Fund case and the instant case is that the emotional trauma in the former case was fatal, whereas petitioner has only been disabled. There was no finding that any organic lesion of tissue had been sustained by plaintiff's decedent in the Idaho case—only a finding that his body had ceased to function. Petitioner's body functions improperly. Is this distinction material here? That ceasing to function is "harm" or "violence" to the physical structure of the body, but functioning improperly with distinct and admitted resulting detrimental effect is not? It seems to us that this, too, is a distinction without a difference.

This is a case of first impression in Texas. The authorities are in substantial conflict in other jurisdictions. This case must be decided in conformity with the discernible intention of our Legislature in enacting the statute presently before this Court. In seeking to implement that intention in our construction of the statute we cannot be concluded by judicial expressions from foreign jurisdictions. Looking next to prior decisions of this Court in ordinary negligence actions, we find the cases of Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Texas 239, 54 S.W. 944, 47 L.R.A. 325, and Houston Electric Co. v. Dorsett, 145 Texas 95, 194 SW. 2d 546. In the Hayter case the plaintiff was riding on a train when another train collided with it, striking the car behind the one in which plaintiff was riding. Plaintiff saw the other train coming and experienced the emotions of a man who expected death. The car where plaintiff was did not leave the track and plaintiff was not even thrown out of his chair. He was not physically disturbed in any way, but it frightened him greatly. Thereafter he developed "neurasthenia" which Blackiston's, *New Gould Medical Dictionary*, defines as "A group of symptoms formerly ascribed to debility or exhaustion of the nerve centers. The symptoms include fatigability, lack of energy, various aches and pains, and disinclination to activity. Some individuals have many symptoms, in others the symptoms center

upon some particular organ or region." Neurasthenia is a general term encompassing a class of nervous disorders including "anxiety neurosis." See Blumer, *"The Practitioner's Library of Medicine and Surgery,* Vol. IX, "Neurology" and "psychiatry," pp. 460-466 (1938). The plaintiff recovered damages in the trial court. The Rairoad appealed.

The appellant's brief in the Court of Civil Appeals (55 S.W. 128) states: " 'The only question that will be considered is whether the plaintiff can recover damages the mere result of mental fright or shock, unaccompanied by any bodily injury inflicted on him by the defendant'." The opinion of that Court contains the following: "It is settled in this state that no recovery can be had for mere fright, where there is no *physical injury* inflicted. (Citing and quoting from Hill v. Kimball, 76 Texas 210, 13 S.W. 59, 7 L.R.A. 618) * * * The distinction is clearly drawn by that case; that is, that recovery cannot be had for suffering from mere fright, but where *physical injury* results from the mental shock a recovery can be had." (Emphasis added) The judgment of the trial court was affirmed.

On apeal, this Court affirmed the lower courts, saying: "But, in the light of modern science,—nay, in the light of common knowledge,—can a court say, as a matter of law, that a strong mental emotion may not produce in the subject bodily or mental injury? * * * We conclude that, where a *physical injury* results from a fright or other mental shock, caused by the wrongful act or omission of another, the injured party is entitled to recover his damages, * * *." (93 Texas 239, 54 S.W. 945) (Emphasis added)

■ Note that there was some evidence in this case that Hayter suffered from pain in the small of his back and that he had "weakened" muscles in that area. This is th most convincing argument in his favor concerning any "physical injury." all other evidence tended to show merely poor digestion; that he was "nervous and shaky" following the accident; that he was bothered with "muscle fatigue and general weakness of the lower extremities," and "nervous exhaustion." Nevertheless, both the Court of Civil Appeals and this Court spoke in terms of the plaintiff having suffered a "physical" injury. The distinction made and emphasized in both opinions is *not* the distinction between a neurosis or psychic disorder and a "physical" injury, but rather that distinction between "mere fright" and a "physical injury," which the Courts assumed to have been suffered by the plaintiff in the Hayter case. Yet it is clear from

reading the opinions and the record in the case that Hayter suffered from no more "physical" harm, indeed if as much, as does the plaintiff in the principal case.

The same analysis produces similar results when applied to the Dorsett case which was decided in 1946. In that case the plaintiff was narrowly missed by defendant Bus Company's negligently operated bus. She sustained no "impact" and suffered no observable lesions or alterations of body tissue. The court nevertheless allowed recovery and again distinguished between "'mere fright" and "physical injury" resulting from emotional shock. The only evidence which appears from the opinions with reference to the injuries there complained of tell us that plaintiff suffered "great emotional upset, shock and fright, resulting in the derangement of her nervous system; and that as a result of such incident she suffered from extreme nervousness, severe headaches, lapse of memory, and brain deterioration." After quoting liberally from Hill v. Kimball and Gulf, C. & S. F. Ry. Co. v. Hayter, supra, the Court again recognized the essential distinction announced in those cases and said, "We are not here concerned with an action based merely on fright, neither accompanied nor followed by bodily injury * * *." The Court accordingly allowed recovery. The conclusion is inescapable that plaintiff in that case was assumed by the Court to have suffered a "bodily" injury and the quotation from the Kimball case and the Hayter case show that the Court made no distinction between "physical injury" and "bodily injury."

■ Another compelling reason to hold that the type of injury sustained by petitioner comes within the definition of "injury" as contained in the statute is the fact that the Workmen's Compensation Act eliminates the right of an employee to bring an action for damages against an employer subject to the Act, except as provided by statute. The holdings in the Hayter and Dorsett cases, supra, support the proposition that the "injury" sustained by petitioner would be compensable under the common law, dependent, of course, upon findings of ordinary negligence. We do not believe that the Legislature intended that such an injury as sustained by petitioner would be compensable at common law, but not under the Compensation Act. To hold otherwise would place the employer in the position of being required to defend an action at common law even though such employer had exercised the foresight to qualify under the terms of the Act and procured compensation insurance for the protection of both the employer and employee. Further, the em-

ployer, in order to provide for himself adequate protection, would be forced to provide for insurance against liability at common law or assume the risk of becoming individually responsible for the payment of any judgment which might be obtained against him as the result of such common law action, while at the same time he was paying compensation insurance premiums for the protection of his employees under the Workmen's Compensation Act.

The question herein discussed was the only one passed upon by the Court of Civil Appeals. We have examined respondent's brief filed in that Court and find that 29 points of error were presented. Only 7 of these points were considered. Several of the points, which were not considered, present questions wherein the Court of Civil Appeals has final jurisdiction.

Therefore this cause is reversed and remanded to the Court of Civil Appeals for further proceedings consistent with this opinion.

Opinion delivered May 11, 1955.

MR. JUSTICE WALKER, joined by Justice Calvert, dissenting.

I am unable to agree with the majority decision. It is a cardinal rule of statutory construction that every part of a statute should be given effect, and that a construction should be avoided that will render any part of an act inoperative, nugatory or superfluous. Standard Oil Co. of Texas v. State, 142 S.W. 2d 519, writ ref. Our Workmen's Compensation Act authorizes compensation for incapacity to work resulting from injury, and provides that the terms "injury" and "personal injury" shall be construed to mean damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom. The majority holding is based upon the proposition that the failure of petitioner's body to function properly constitutes damage or harm to the physical structure of his body within the meaning of the statute. All incapacity to work results from the failure or inability of the body to function normally. It would seem to follow from the decision in this case that all disability resulting from an accidental event occurring in the course of employment is compensable. The statutory definition of injury is, therefore, rendered inoperative and nugatory in violation of the fundamental principle of construction mentioned above. The alternative construction, which was adopted by the Court of Civil Appeals, and rejected by this

Court, is certainly not unreasonable and does no violence to any word or provision of the statute.

The evidence quoted in the majority opinion undoubtedly supports the conclusion that the petitioner's condition is real and not simulated, is caused by the occurrence described, is susceptible of diagnosis, and has caused disability. The two medical experts who testified in the trial of the case are in agreement, however, that petitioner's disability is due entirely to a mental condition and is not caused by damage to the physical structure of his body. Dr. Brown, who was offered by the petitioner, testified, in part, as follows:

"Q. * * * You say this nervous system takes in the brain, and the spinal cord, and branches of the nerves and what not. Can you trace this failure to function to any of those specific organs?

"A. Yes. It is the brain.

*   *   *   *   *

"Q. In other words, this failure of his mind to function properly in connection with this specific thing we have been talking about, this climing and what not?

"A. Yes.

*   *   *   *   *

"A. 'Trauma' is just a synonym for injury, and 'psychic trauma,' of course, refers to trauma to the psychia or to the mind of the individual rather than to the physical structure. It is an interference with function rather than an interference with the structure.

"Q. Now, as I understand you then, what you have been testifying about here is a psychic trauma?

"A. Psychic trauma, yes.

"Q. And that is something that interferes with the functioning of the nervous system rather than something that damages the physical structure of the body?

"A. That is correct."

The following is an excerpt from the testimony of Dr. Skogland, who was called by the respondent:

"Q. Did you arrive at any conclusion or diagnosis about the man's condition at the time you saw him?

"A. Yes. I felt that he had no actual organic disease of his

brain or his nervous system or no actual injury of his brain or nervous system. In other words, from the viewpoint of structure and all, his brain and his nervous system was as good as it ever was, but I felt that the fellow had what we call an 'anxiety reaction.' In other words, he had had a close call and he had gotten sort of anxious about it and had not yet settled down.

"Q. All right, sir. I would like to ask you another question or two about that and that will be all, Doctor. Is this anxiety state, I believe that is what you call it, something that manifests itself in any change in the condition of the brain or nervous system physically? Is there anything you can see there or find if you examine the man internally?

"A. No.

"Q. I am sure I am clumsy about my question, Doctor, because I am not familiar with that field, but I will try to boil it down to this. If you had some way of getting inside the man's body now, and examining his brain, and his nervous system, the nerves and whatever goes with it, would you find any change in the physical make-up of that structure since the time of this occurrence that he told you about in October of 1951?

"A. No. He would be perfectly normal."

As pointed out in Hood v. Texas Indemnity Insurance Company, 146 Texas 522, 209 S.W. 2d 345, the statutory definition of injury must be liberally construed. It should be noted, however, that the statute states that the term "shall be construed" to mean damage or harm to the physical structure of the body. We are, therefore, not permitted to assign a common law meaning to the word "injury" or to construe the term as we consider proper, but are required to determine whether the petitioner's disability arises from damage or harm to the physical structure of the body.

The words "damage" and "harm" are practically synonymous, and their presence in the statute does not, in my opinion, support the majority conclusion. The critical words of the Act as applied to the present case are "physical structure of the body." The majority opinion of the Court of Civil Appeals (268 S.W. 2d 531) calls attention to Webster's definition of "physical" as "of or pertaining to the body as contrasted with the mind," and points out that as antonyms to "physical" the same authority uses the words "mental" or "emotional." The meaning of the word "structure," appears to be of equal, if not greater, importance in determining the proper construction of the stat-

ute, and that term is defined by Webter as "arrangement of parts, or organs, or of constituent tissues or particles, in a substance or body." If we assign to the words of the statute their usual meanings, the intention of the Legislature is clear. It would, in fact, be difficult to conceive how an intention to exclude a purely mental or nervous injury could be stated more plainly.

It might well be held that the failure or inability of the body to function properly constitutes damage or harm to the body, but the Act requires, not simply damage or harm to the body, but damage or harm to the physical structure of the body. With the exception of the bruise and cable burn, which resulted in no disability, the structure of petitioner's body was the same after the occurrence as it was before the accident. The structure of his body is the same at great heights and in precarious situations as it is on the ground. His blood pressure, hypersensitiveness to pain, tremor of the closed eyelids and underactive deep reflexes are symptoms of the mental illness, but the evidence is conclusive that there is no organic injury and it does not appear that his disability results from the symptoms mentioned.

The workmen's compensation statutes in England and in most American jurisdictions require merely an "injury" or a "personal injury," and contain no definition of the terms. Charon's Case, 321 Mass. 694, 75 N.E. 2d 511, and Burlington Mills Corporation v. Hagood, 177 Va. 204, 13 S.E. 2d 291, cited in the majority opinion, were decided under statutes which contain no definition of "injury," and are not persuasive as to the proper construction of the Texas Act.

The statutes of a few American states, including Nebraska, Louisiana and Idaho, require "damage" or "harm" or "violence" to the "physical structure" of the body. In Bekeleski v. O. F. Neal Co., 141 Neb. 657, 4 N.W. 2d 741, 743, a passenger on an elevator operated by the claimant was caught between the floor of the elevator and the floor of the building and killed. The claimant sustained no physical injury to her person, but was in the elevator with the dying man for some thirty minutes. As a result of the shock to her nervous system, she was unable to perform the work of an elevator operator. After referring to the statutory definition of injury as meaning " 'only violence to the physical structure of the body' " and pointing out that the act should be liberally construed, the Court said:

"* * * The language indicates a clear distinction between physical and bodily injury on the one hand and mental, nervous and psychiatric injury unaccompanied by violence to the physical structure of the body on the other. The plain import of the words used eliminates from the operation of the law disabilities resulting from mental disturbances, nervousness and psychiatric ailments when violence to the physical structure of the body cannot be established. * * *.

"* * *

"It is clear to us that to be compensable an accident arising out of and in the course of the employment must be accompanied by damage to the physical structure of the body of the claimant. * * * While the act should be construed liberally, as we have many times held, it should not be extended to cases which by plain language are excluded from its scope. * * *."

The majority opinion cites the cases of Peavy v. Mansfield Hardware Lumber Co., 40 So. 2d 505, and Roberts v. Dredge Fund, 71 Idaho 380, 232 Pac. 2d 975. In the Peavy case the workman lost balance and fell upon his head and left side, resulting in a slight concussion which rendered him unconscious for a time. The pleadings and proof showed that he suffered from a traumatic neurosis, a mental or nervous illness resulting from his physical injuries. The right to compensation in such a case is established by our decision in Hood v. Texas Indemnity Insurance Co., supra. In the Dredge Fund case an electrical short circuit was accompanied by a roar and a ball of fire. The employee, who was standing near by, did not receive an electrical shock, but the shock to his nervous system affected his heart and caused his death. In its opinion affirming the award of compensation the court cites and apparently relies upon the decisions from jurisdictions in which the statutes do not require damage or violence to the physical structure of the body. The majority opinion in the present case reasons that the only possible distinction between the Dredge Fund case and the instant case is that in the former the employee died, and concludes that the distinction is not material because in the one case the body ceased to function and in the other it functions improperly. The distinction was expressly recognized by the Supreme Court of Idaho. It should be observed, moreover, that death inevitably results not only in the cessation of bodily function, but also in the complete disintegration of the physical structure of the body.

A substantial portion of the majority opinion is devoted to

a discussion of Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Texas 239, 54 S.W. 944, 47 L.R.A. 325 and Houston Electric Co. v. Dorsett, 145 Texas 95, 194 S.W. 2d 546. These cases undoubtedly reaffirm the rule in Texas that recovery may be had at common law, the elements of negligence and proximate cause being present, for physical and mental pain and suffering resulting from an injury to the nervous system caused by emotional shock. The holdings that the nervous prostration, muscular weakness, headaches and other pains suffered by the plaintiffs in those cases were sufficient physical injury to justify recovery at common law, are not, in my opinion, authority for the proposition that the petitioner in the instant case sustained damage or harm to the physical structure of his body. The fact that these decisions would support a recovery by petitioner in this case in a common law action against his employer based upon negligence would afford a compelling reason for extending the Compensation Act to cover mental illness if we were vested with legislative power. It is submitted, however, that the contrary is true when we approach the question from the standpoint of judicial construction.

There is no common law of workmen's compensation, and the petitioner's right to compensation must arise solely from the applicable provisions of the statute. The first Workmen's Compensation Law in Texas was enacted in 1913 and did not undertake to define "injury" or "personal injury." The definition which now appears in our statute was included in the amendment of 1917 and has been a part of our law since that time. It originally appeared as part of Art. 8309, Sec. 1; but was transferred to and retained as part of Art. 8306, Sec. 20, when the Legislature amended the law in 1947 to provide for coverage of occupational diseases. Had the Legislature intended that the Act should apply to all injuries for which recovery might be had at common law, the result would have been accomplished simply by omitting the definition of injury from the statute. The inclusion of the definition clearly indicates the intention of the Legislature to limit the application of the law and to exclude certain injuries for which recovery might be had at common law.

Since the petitioner's disability is due entirely to his mental condition, the failure of his mind to function property, it is my opinion that it does not result from injury as that term is defined by the Compensation Act. The propriety of extending the Act to cover cases of this character, and the consequences of failure to do so, are matters for consideration by the Legislature.

If a change in the law is to be made, it should come from that body with the provision of such safeguards and restrictions as it may deem appropriate.

Delivered May 11, 1955.

Rehearing overruled June 8, 1955.