Regonald T. CLAYTON, Appellant,

v.

**EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Appellee.**

No. 5123.

Court of Civil Appeals of Texas, Waco.

April 27, 1972.

**488**

Bader, Wilson, Menaker & Cox (Frank L. Branson), Dallas, for appellant.

James P. Wagner, Ben Warder, Jr., Dallas, for appellee.

HALL, Justice.

The plaintiff-appellant, Regonald T. Clayton, received an accidental on-the-job injury that caused the eventual removal of his right eye and its replacement with a prosthesis. Plaintiff brought this action seeking total and permanent disability benefits for a general injury under the workmen's compensation law on the theories that, in addition to the injury to his eye, he suffered (1) a neurosis, which he contends is a compensable general injury; and (2) he sustained a general injury to his central nervous system; and (3) the specific injury to the eye extended to and affected his body generally.

The defendant-appellee, Employers Mutual Liability Insurance Company of Wisconsin, admitted that plaintiff suffered the loss of his right eye, and stipulated to every issue required to be proved by plaintiff to recover benefits for that specific injury; however, defendant denied that plaintiff sustained any injury other than to his right eye, and further denied that the injury to the eye extended to and affected other parts of plaintiff's body.

At the close of plaintiff's proof, on motion of the defendant, the court withdrew the case from the jury and rendered judgment that plaintiff recover benefits only for the loss of the eye, plus his medical bills. Plaintiff attacks the trial court's summary ruling and asserts that the record supports each of his theories of general injury.

The rules by which we must determine whether the trial court's ruling is correct are well settled. They require us to accept as true any probative evidence in the record that supports plaintiff's case; to resolve in plaintiff's favor any conflicts and inconsistencies in the evidence; to interpret the evidence and all reasonable inferences that can be drawn therefrom in plaintiff's favor; and to disregard the evidence and inferences that are favorable to defendant. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60, 61 (1953); Anderson v. Moore, (Tex.Sup., 1969) 448 S.W.2d 105. If, contrary to plaintiff's contention, there is no probative evidence in the record that supports a theory of general injury pleaded by him, then the case was properly withdrawn from the jury. Otherwise, the trial court's ruling is incorrect. McLain v. Hodge, (Tex.Civ.App.—Waco, 1971, writ ref., n. r. e.) 474 S.W.2d 772, 774.

The record shows that the accident in question happened about 10:00 A.M. on July 26, 1968; that plaintiff was working at an assembly line on which plastic bottles were filled with ammonia; that while plaintiff was attempting to repair the rail on a conveyor a bottle was caused to squirt ammonia into plaintiff's right eye and onto

other parts of his face, including his left eye; that the pain was immediate and excruciating; that plaintiff couldn't see or get his breath, was scared, and was "hurting all over" and felt as though someone had hit him in the back of the head and that his head was bursting; that he began "jumping around" and screaming for help and yelling "I'm dying, I'm dying, I'm dying"; that unsuccessful attempts were made to wash the ammonia from plaintiff's eyes with water; that he was carried to the Launey Clinic and then to Gahagan's Clinic; that drops were put in his eyes at each place; that the pain became worse and he was "kicking and jumping around in the chair" at Gahagan's Clinic and had to be held down; that he passed out at Dr. Gahagan's office; that he waked about 4:00 P.M. in the hospital; that he was hurting all over, "not just my head, just all over" ; that he felt as though he had been kicked in the stomach; that he vomited; that when he waked the next morning he had a patch over his right eye; that he saw in the mirror that his face was red on both sides and was swollen around the eyes; that he removed the patch and saw in the mirror that his right eye was badly burned and swollen and "sickly looking," and that to look at it made him sick; that during the second night he began to realize that he might lose his eye; that during his five-day stay in the hospital he was in great pain, and had poor balance; that while in the hospital he had a very poor appetite, and lost 20 pounds; that after leaving the hospital, plaintiff returned to Dr. Gahagan; that he saw Dr. Gahagan every day for about two weeks, then twice a week for about a month, then once a week until August, 1969; that Dr. Gahagan's treatments did not relieve the pain, and it got worse; that plaintiff passed out "quite a few times" when being treated by Dr. Gahagan, and the treatments caused him to sweat and tremor; the treatments consisted of placing six drops of different kinds in plaintiff's eyes at five minute intervals; that during the period of Dr. Gahagan's treatments the right eye remained inflamed and swollen; that plaintiff wore dark glasses because he could not bear to look at the eye and did not believe others could; that when he would look at the eye he would become ill; that on August 4, 1969, and on September 10, 1970, cornea transplants were performed on plaintiff's right eye, but neither was successful; that, meanwhile, plaintiff suffered throbbing pain and swelling in the eye, and hurting in his head and stomach; that on September 28, 1970, he was returned to the hospital; that he had lost weight and was "all shook up and nervous and couldn't eat anything"; that he was fed glucose for six days and then released from the hospital; that the pain became unbearable and the doctor concluded that the nerve to the eye should be killed; that plaintiff was returned to the hospital on October 15, 1970, and the doctor inserted a hypodermic into plaintiff's right eye and injected alcohol into the eye; that with his left eye, plaintiff watched the needle coming toward him; that it "scared (him) half to death" because he knew the eye "was still tender and hurt and that needle was going to hurt like the devil"; that the needle was in his eye for 30 to 60 seconds; that plaintiff was tense and gritting his teeth and clenching his fists and kicking, and the nurses were holding him down; that since then, and even now, plaintiff dreams of "that needle coming down at me", and wakes "shaking and sweaty, and sick and nervous"; that after the alcohol injection the eye became more swollen and inflamed, and remained so until January 18, 1971, on which date plaintiff was hospitalized and the eye was removed; that another operation was performed on the eye on July 20, 1971; that plaintiff has had eight prosthesis since the eye was removed, and has had approximately 30 separate fittings made by the prosthetist; that the prosthesis causes the eye "to run and matter up quite a bit" and "get real sore"; that plaintiff has never been free of pain and headaches since the injury, and has difficulty keeping food on his stomach; that plaintiff is now nervous and fractious and moody at work, and

he was not so before the injury; that he has difficulty with the prosthesis falling out while he is working; that on the job he is "jumpy" if there are activities on his "blind side," and he is not as efficient in his work as he was before the injury; and that plaintiff suffers feelings of humiliation, embarrassment and inadequacy as a result of the appearance of the eye, the dropping of the prosthesis, and the loss of use of the eye.

Dr. Robert Story Glen, a psychiatrist, is presently treating plaintiff. He stated that when he first saw plaintiff, which was about three months before trial, plaintiff's hands were trembling, and plaintiff was "very, very anxious, very uncomfortable about his eye" around others; and "was most shy about it." He said that plaintiff was "feeling inadequate and very uncomfortable in that he couldn't pull his weight as a fully qualified worker because as far as he was concerned * * * he only could see part of the area in which he had to work. So this would make him very anxious and very nervous and was very humiliating. * * * Even more than not being able to perform, is his fear of loss of the other eye and he's extremely frightened about that. * * * The next fear is the fear of being unable to be an effective man, * * * being unable to be a good husband to his wife because he feels that he just can't do the things that a man does."

Based upon his study of the medical reports on plaintiff, and the history he took from plaintiff, and his own examinations and observations of plaintiff, Dr. Glen expressed the opinion that, separate and apart from the injury to the eye, plaintiff sustained an injury to his central nervous system, including the anatomic nervous system, as a result of the accident in question. As examples of the functions of the anatomic nervous system, he stated that it "gives us sweaty palms, changes our heart rate, affects our muscle tone, affects the tone of our muscles in our intestines in that we get intestinal cramps, affects the

eyes and the focusing down of the pupils." Moreover, Dr. Glen is of the opinion that plaintiff suffered, and is suffering, a "severe chronic anxiety reaction," a "traumatic neurosis," as a result of the accident and damage to his eye and nervous system.

Answering a question that included the definitions of "injury," "producing cause," and "total disability" that are customarily submitted to the jury in a workmen's compensation case, Dr. Glen testified that it was his opinion that, as a result of the neurosis and the injury to plaintiff's nervous system, plaintiff was totally and permanently disabled from performing the usual tasks of a workman, and that this disability began at the time of injury on July 26, 1968.

■ The rule is settled in Texas that neurosis that produces physical disability is compensable as a general injury under our workmen's compensation laws. Bailey v. American General Insurance Company, 154 Tex. 430, 279 S.W.2d 315 (1955); Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345 (1948). We therefore conclude that the evidence of neurosis suffered by plaintiff, and the evidence of injury to his central and anatomic nervous system, coupled with the proof of the resulting disability, entitled plaintiff to a submission of his case to the jury on those theories; and that the trial court erred in summarily withdrawing the case from the jury.

■ Plaintiff's remaining complaints relate to the exclusion of evidence. He contends that the trial court erred "in refusing to allow plaintiff to tell the jury whether the injury to his mental health affected his ability to get and keep employment"; and "in refusing to allow lay testimony that plaintiff was more nervous after the injury which affected his ability to work"; and "in refusing to allow testimony by lay witnesses about exclamations of pain (by plaintiff) and observance of expression of pain on plaintiff's face." The witnesses from whom the testimony was sought had

personal knowledge of the facts sought to be proved. The testimony was improperly excluded. 23 Tex.Jur.2d 700–706, Evidence, Secs. 494, 495; 1 McCormick and Ray, Texas Law of Evidence 605, Sec. 833.

The judgment is reversed and this cause is remanded for trial.