810 So.2d 1118 (2002)
Eva PARTIN
v.
MERCHANTS & FARMERS BANK.
No. 2001-C-1560.
Supreme Court of Louisiana.
March 11, 2002.
*1119 Bradley J. Gadel, Counsel for Applicant.
KIMBALL, Judge.
In this case, Claimant, Eva Marie Partin, alleged that she suffered a compensable mental injury when her employer, Merchants and Farmers Bank, demoted her for lack of managerial skills after eighteen years of employment. The Office of Workers' Compensation (OWC) awarded compensation benefits to Claimant and the bank appealed. We granted certiorari to determine whether Claimant's mental condition is compensable under the Workers' Compensation Act. For the following reasons, we conclude that the bank's demotion of Claimant produced stress that was not unexpected or extraordinary as required by the Act, and we therefore reverse the order awarding benefits to Claimant.

FACTS AND PROCEDURAL HISTORY
The record indicates that Claimant gave the following testimony at the compensation hearing. She began work with the bank in 1978 as a bookkeeper, after which she worked as a teller. Thereafter, she received a raise with a promotion to vault teller, and then a raise with a promotion to teller supervisor. She worked next as vault teller supervisor, and then received a raise and promotion to acting branch manager, followed by a promotion to branch officer. She requested a raise when she became a branch officer in 1994, but she did not receive it. When she asked if there were any improvements she could make in order to get the raise, her supervisor, Kay Wilbanks, did not give her any suggestions, but told her that not every promotion came with a raise. Claimant testified that, before the demotion in question, she had never been demoted, received a pay cut, punished for any misconduct, told that she did not have satisfactory management skills, or received written reprimands. She was comfortable with her status at the bank and had no idea there was a problem or a question about her job.
She further testified that she conducted a surprise audit of a teller, Helen Childers, on June 4, 1996. During the audit, she learned that Ms. Childers' drawer was over balance by five dollars, and that Andrea Howard, the vault teller, was under balance by five dollars. They investigated the problem and found a ticket showing that Ms. Childers had earlier bought change from Ms. Howard, and Ms. Childers had accidentally recorded on the ticket five dollars more than she should have. Claimant informed Ms. Childers that it was against bank policy to simply swap the five dollars in cash. Therefore, because Ms. Childers had already closed out her drawer, Claimant instructed Ms. Childers to make a handwritten "cash-in" ticket in the amount of five dollars, and she respectively instructed Ms. Howard to make a handwritten "cash-out" ticket in the amount of five dollars. Claimant made a corresponding notation on her cash audit sheet that Ms. Childers' drawer had an additional five dollars. Claimant explained that this was the legal way to correct the error and make the two tellers balance without exchanging cash. She knew that the bank had a policy against forced-balancing[1], and that it carried a penalty of termination, but she explained that this was not forced-balancing.
After settling the matter, Claimant left the two tellers and attended to other work. While Claimant was gone and without her knowledge, Ms. Childers failed to credit *1120 the cash-in ticket to her drawer. Ms. Childers then gave Ms. Howard the five dollars, which put them in balance, and they tore up their cash-in and cash-out tickets. This resulted in a five-dollar discrepancy between Ms. Childers' balance sheet and Claimant's audit sheet, because Claimants' audit sheet still indicated that Ms. Childers had five extra dollars.
The bank's internal auditor, Gene Tate, noticed the discrepancy in mid-July, 1996. Ms. Wilbanks questioned Claimant, Ms. Childers, and Ms. Howard about the discrepancy, and they each wrote a separate statement regarding their version of what had happened. Claimant testified that Ms. Wilbanks never said anything to her about forced-balancing the drawer, and that nothing at all was said about the incident after they turned in their statements. Claimant therefore assumed that the bank had found their explanations to be acceptable.
Toward the end of the working day on August 19, 1996, Ms. Wilbanks informed Claimant that she should report to the main office at 8:00 the next morning for a meeting. At the meeting, Ms. Wilbanks and Mr. Ron Steed, the president of the bank, told Claimant that she was being demoted because she lacked managerial skills, but that she could return to work at a different branch as a teller. Claimant testified that they never mentioned the incident involving the five dollars, and that the first time they mentioned it was during the first workers' compensation meeting in April or May of 1997. Although no one raised his or her voice and no one used profanity or vulgarity during the August 20 meeting, Claimant found the news of her demotion shocking. She became very upset, and was shaking and crying. She stated that she did not understand why she was being demoted after having been in a supervisory position at the bank for thirteen years, she did not know the bank was dissatisfied with her performance, and she did not think that this severe action might be pending against her.
Claimant never returned to work after the August 20 meeting. She went immediately to her doctor, who later referred her to a psychiatrist, Dr. Walker Goodin. She described her symptoms as sleeplessness, crying, pacing, anxiety, and panic attacks. She went to the emergency room several times because she could not function. In January, she went to the unemployment office, but was unable to find a job that would suit her.
The record also indicates that Ms. Wilbanks gave the following testimony at the compensation hearing. Based on the five-dollar discrepancy between Claimant's audit sheet and Ms. Childers' teller sheet, Mr. Tate told Ms. Wilbanks that Ms. Childers' had forced-balanced her window and that Claimant assisted in it by not reporting the error to the bank. Ms. Wilbanks brought the matter to the attention of Mr. Steed and Mr. Ken Hughes, the bank's executive vice president. Mr. Tate wanted to terminate both Ms. Childers and Claimant on the spot, but Mr. Steed and Ms. Wilbanks decided to hear their explanations, so Ms. Wilbanks instructed Claimant and Ms. Childers to submit written statements. Thereafter, Ms. Wilbanks left on her required vacation and returned on August 19, 1996.
Upon her return, Ms. Wilbanks reviewed everything and determined that the incident was not accidental. Rather, she determined that Ms. Childers lowered her fives to make herself in balance, and Claimant counted the extra five, but Claimant merely sent her audit sheet to Mr. Tate instead of reporting that Ms. Childers had five extra dollars. She explained that there is a difference between helping a teller to balance and conducting a surprise audit. A surprise audit has *1121 specific instructions, and its purpose is to discover whether a teller is out of balance and to report the results, not to correct the error for the teller. She emphasized that the surprise audit procedure is required by the FDIC because the bank is entrusted with the public's money. Because the auditing process is all about comparing cash amounts, Ms. Wilbanks' assessment was that a person who conducts an audit as Claimant did has either very poor managerial skills or none at all. Mr. Steed and Ms. Wilbanks agreed that Ms. Childers should be terminated and Claimant should be demoted to the position of "teller two," which Ms. Wilbanks described as the highest non-managerial position at the bank. The bank was unable to terminate Ms. Childers, however, because Ms. Childers had already left the bank due to her husband's military transfer. Ms. Wilbanks' account of the August 20 meeting was consistent with that of Claimant, except that Ms. Wilbanks claimed that Mr. Steed did mention the incident regarding the five dollars, and that he also mentioned Claimant's previous failure to ensure that there was a blank tape in one of the bank's security cameras during a robbery in 1994.
Ms. Wilbanks further testified regarding previous times the bank indicated its dissatisfaction with Claimant's managerial skills. She stated that, in December of 1994, when Claimant expressed that she was disappointed in the amount of her raise, she explained that Claimant received the same raise as most everyone, and that the bank was not real happy with her performance at the branch because of the incident with the security camera tapes and because the bank received more customer complaints from Claimant's branch than any other. Also, on January 6, 1995, when Claimant expressed to Ms. Wilbanks and Mr. Steed that she was unhappy about her raise, they discussed their dissatisfaction with her performance and told her she needed to do a better job of managing the branch. Lastly, on January 20, 1995, Ms. Wilbanks reprimanded Claimant for complaining to a co-worker about her salary.
Dr. Goodin diagnosed Claimant with a major depressive disorder, which was triggered by her demotion. Dr. Goodin also acknowledged that Claimant had prior emotional traumas, such as several molestations in childhood and adolescence, and other instances of rejection, which may have contributed to the impact of the emotion. At the time of his deposition, he believed that long-term treatment with medication had stabilized Claimant's condition, but he stated that her symptoms were not in remission. He testified that further progress was necessary before she could return to any work environment.
Dr. Paul Ware, a psychiatrist who examined Claimant at the bank's request, agreed that Claimant suffered a major depressive disorder, although he believed that Claimant had a tendency to portray herself as more impaired than she actually was, and that her passive dependent personality contributed to her continuing disability.
At the conclusion of the hearing, the hearing officer found that Claimant was credible and that it was not seriously disputed that Claimant became hysterical at the August 20 meeting. He also found that a demotion being handled in a professional, private, and calm manner does not necessarily mean that it could not have caused the average, reasonable employee mental injury. Lastly, regarding Claimant's past emotional rejections, he reasoned that the decision is not about the average person but about Claimant, and that the bank must take her as it finds her. As a result, the hearing officer concluded that Claimant demonstrated by clear and convincing evidence that she sustained mental injury caused by extraordinary *1122 stress related to her employment, and that she therefore suffered a compensable work-related accident and was entitled to benefits.
The bank appealed to the third circuit court of appeal, which affirmed the ruling of the OWC. The court of appeal reasoned that an objective standard should be used to determine whether the nature of the stress suffered by Claimant was extraordinary. It concluded that an ordinary reasonable person of usual sensibilities would find that, under these facts, the stress brought on by the demotion was extraordinary. The court recognized that employees are expected to follow the workplace rules, but that discipline should be commensurate with the infraction. It concluded that Claimant's demotion and significant salary reduction was sudden, unexpected, and extraordinary as required by the controlling statute, and that Claimant had established by clear and convincing evidence that she is temporarily and totally disabled and entitled to benefits and medical expenses.
We granted certiorari to consider whether Claimant's mental condition is compensable under the Workers' Compensation Act. Partin v. Merchants & Farmers Bank, 01 C 1560 (La.9/21/01), 797 So.2d 55.

LAW AND ANALYSIS
The bank contends that the court of appeal erred in affirming this award of benefits because an employer's decision to demote an employee is merely a "general condition of employment," which is not compensable. The bank urges that an employer's failure to handle a demotion or a termination properly is a matter for tort law. In contrast, Claimant contends that this award of benefits was proper and is supported by the jurisprudence.
Prior to 1989, Louisiana courts were split on whether mental injuries caused solely by mental stress (known as "mental/mental" claims) were compensable under the Workers' Compensation Act. At that time, the term "injury" was defined in subsection 1021(7) of the Act, which stated:
"Injury" and "personal injuries" include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted.
La. R.S. 23:1021(7) (1989). To remedy this split in the courts, a bill was proposed in the state legislature that eliminated the compensability of mental/mental claims. Minutes of Meeting, House Committee on Labor and Industrial Relations 15 16, May 26, 1989, Reg. Sess. 1989. It retained the text of subsection 1021(7) but redesignated it as 1021(7)(a), and then added subsection 1021(7)(b), which stated:
(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter.
H.B. No. 1431, Reg. Sess. 1989 (original version). This amendment was proposed along with many other amendments to the Workers' Compensation Act, which were presented together as House Bill No. 1431. The stated purpose of HB 1431 was to address the problem of employers' increased liability in many areas, including mental injury claims. House Minutes, supra at 15. The bill's author explained that the bill addressed the "crisis" in Louisiana regarding workers' compensation insurance: Louisiana had the sixth highest workers' compensation insurance rate in the United States, which prevented new businesses from being able to obtain the *1123 insurance. Minutes of Meeting, Senate Committee on Labor and Industrial Relations 4, June 7, 1989, Reg. Sess. 1989 A proponent of the bill explained that the bill addressed the fact that Louisiana courts had been ignoring much of the language in the Workers' Compensation Act, and that if the laws had been interpreted as they were written, constant changes would not be necessary. House Minutes, supra at 18. He stated that the bill was meant to statutorily override cases that had liberalized the workers' compensation law regarding mental stress and heart attacks, and to impose more difficult tests in order to recover. Senate Minutes, supra at 5.
The proposed language in subsection 1021(7)(b) regarding mental/mental claims passed the house on June 1, 1989. Official Journal of the House of Representatives of the State of Louisiana, Twenty-Ninth Day's Proceedings 30, Reg. Sess. 1989, June 1, 1989. Twelve days later, however, the Senate adopted an amendment which added a clause to subsection 1021(7)(b) that made mental/mental claims compensable in certain circumstances. Official Journal of the Senate of the State of Louisiana, Twenty-Ninth Day's Proceedings 14, Reg. Sess. 1989, June 13, 1989. The added clause is indicated below with underlined text:
(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.

Id. This amendment was adopted by the house on June 21, 1989, and the bill passed the legislature with the added language that mental/mental claims were not compensable except under those limited circumstances. House Journal, supra, Forty-Third Day's Proceedings at 30, June 21, 1989. The governor signed HB 1431 on June 30, 1989, and it became effective as Act 454 of 1989 on January 1, 1990. 1989 La. Acts 434.
During the window of time between the enactment of HB 1431 and its effective date, this court held that a mental/mental claim was compensable as an "injury" under the pre-amendment version of La. R.S.23:1021(7) in Sparks v. Tulane Med. Center Hosp. & Clinic, 546 So.2d 138 (La. 1989) (decided on September 11, 1989). Our decision today, though, is governed by the new, amended version of the law governing mental/mental claims found at La. R.S. 23:1021(7)(b), as quoted above. Subsection 1021(7)(a) (which was previously designated as subsection 1021(7)) is no longer at issue because the new law specifically provides for mental/mental claims in subsection 1021(7)(b).
In a mental/mental claim, a claimant must not only satisfy subsection 1021(7)(b), but also the general requirements for recovery under the Workers' Compensation Act, found in La. R.S. 23:1031. Section 1031 limits recovery under the Act to situations where "an employee not otherwise eliminated from the benefits of this Chapter receives personal injury by accident arising out of and in the course of his employment." La. R.S. 23:1031 (emphasis added). We note that subsection 1021(7)(b) incorporates this entire emphasized phrase into its definition of mental injury, stating that a mental injury or illness resulting from work-related stress shall not be considered a "personal injury by accident arising out of and in the course of his employment" and is not compensable unless the mental injury resulted from a sudden, unexpected, and extraordinary stress related to the employment. In contrast, subsection *1124 1021(7)(a) does not contain this language, but simply defines "injury" and "personal injuries" as injuries by violence to the physical structure of the body and their naturally-resulting diseases or infections. La. R.S. 23:1021(7)(a). Yet, by incorporating the language from section 1031 into subsection 1021(7)(b), we do not think that the legislature intended the requirement of "sudden, unexpected, and extraordinary stress related to the employment" to satisfy the whole of "personal injury by accident arising out of and in the course of employment." Our conclusion is supported by the legislative history of subsection 1021(7)(b). As discussed above, the house originally intended for subsection 1021(7)(b) to preclude the compensability of all mental/mental claims. It accomplished this by referring to the basic requirements of compensability under section 1031 in a peremptory statement that "a mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter." H.B. No. 1431, Reg. Sess. 1989 (original version) (emphasis added). However, when the senate later chose to amend that subsection and make mental/mental claims compensable in certain limited circumstances, it merely tacked on an "unless" clause to the end of the original language, rather than redrafting the entire subsection. Senate Journal, supra, Twenty Ninth Day's Proceedings at 14, June 13, 1989. The logical deduction is that the legislature did not intend to displace the basic requirements of accident, arising out of employment, and in the course of employment in mental/mental claims. Rather, the legislature intended to provide narrow circumstances under which mental/mental claims would be compensable, assuming that the requirements of accident, arising out of employment, and in the course of employment were also satisfied. Therefore, a mental/mental claimant must fulfill both the requirements in section 1031 and those in subsection 1021(7)(b) in order to recover.
For the reasons below, we conclude that Claimant's injury fails to meet the requirements of subsection 1021(7)(b). Because her failure to meet the requirements of subsection 1021(7)(b) precludes Claimant's recovery for her mental/mental claim, it is not necessary to also discuss whether the requirements of section 1031 are met.
In analyzing Claimant's injury under subsection 1021(7)(b), we first note that this subsection states in part that a mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence. Claimant contends that the stress brought on by her demotion was unexpected and extraordinary because Claimant's career at the bank was well-established and successful, Claimant was close to reaching retirement, and the demotion was not a known, scheduled event. Claimant testified that she in no way expected this demotion because she assumed the bank was satisfied with her written explanation of the incident involving the five dollars, and because she had no prior indications that the bank was dissatisfied with her performance as a manager. Nevertheless, we find that, even under the facts as presented by Claimant, this demotion does not fit the meaning of unexpected and extraordinary stress under subsection (7)(b).
Although subsection (7)(b) falls under the "definitions" subpart of the Workers' Compensation Act, it reads more like a declaration of the conditions under which *1125 a mental injury will be compensable. In this way, it is not so much a definition of mental injury as it is a definition of compensable mental injury. Under the statute, a mental injury is compensable depending upon the type of stress which triggers that injury. The legislative history of subsection (7)(b), outlined above, reveals an active decision on the part of the legislature to so condition compensability in order to tighten the reigns of recovery for mental/mental claims. The desire for more difficult tests and restricted recovery indicates that the legislature intended that the nature of the stress itself be evaluated, rather than the stress being evaluated from the employee's perspective. This of course differs from the determination of whether an "event" was unexpected or unforseen under the accident requirement of subsection 1021(1), which is made by viewing the event from the employee's perspective. See Williams, 546 So.2d at 156; Parks v. Insurance Co. of N. Am., 340 So.2d 276, 281 (La.1976); Ferguson v. HDE, Inc., 270 So.2d 867, 870 (La.1972). Yet we find that this different evaluation of the "stress" under subsection 1021(7)(b) is mandated by the legislative intent. If the stress were evaluated from the employee's perspective, much wider recovery would result under subsection (7)(b) because nearly every employee would consider extraordinary a stress that caused him mental injury. Although Louisiana courts have construed the terms of the Workers' Compensation Act liberally in light of its "beneficient purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce," there is a legislative intent to the contrary in subsection (7)(b). Sparks, 546 So.2d at 146 (quoting Parks v. Insurance Co. of N. Am., 340 So.2d 276, 281 (La.1976)). The most likely inference is that the legislature intended to restrict recovery under subsection (7)(b) to those mental injuries that result from stresses which, by their nature, are sudden, unexpected, and extraordinary in the usual course of employment in that working environment.
Given its proper and necessary interpretation, it is evident that the new law under subsection 1021(7)(b) addresses the concerns previously expressed by this and other Louisiana courts. Before subsection 1021(7)(b) took effect and provided an express statutory basis for mental/mental claims, courts struggled to find a place for such claims under what was then subsection 1021(7), which basically restricted "injuries" to those caused by violence to the physical structure of the body. See, e.g., Sparks v. Tulane Med. Center Hosp. & Clinic, 546 So.2d 138 (La.1989); Jones v. City of New Orleans, 514 So.2d 611 (La. App. 4 Cir.1987); Guillot v. Sentry Ins. Co., 472 So.2d 197 (La.App. 5 Cir.1985); Taquino v. Sears, Roebuck and Co., 438 So.2d 625 (La.App. 4 Cir.1983). Sparks reasoned that mental/mental claims were compensable under the old law because there was violence in the form of a harmful effect on the physical structure of the body, which includes the complex of integrated and interdependent bones, tissues and organs that function together by means of electrical, chemical and mechanical processes. Sparks, 546 So.2d at 145-46 (quoting Bailey v. American Gen. Ins. Co., 154 Tex. 430, 279 S.W.2d 315, 318 (1955)). In doing so, the Sparks court was also aware of the potential problems that could result if every claim of mental injury were compensable. While the strict language in subsection 1021(7) did not appear to lend itself to a limitation on the compensability of mental/mental claims, the "accident" requirement did. The court stated:
[A] mere showing that a mental injury was related to the general conditions of employment, or to incidents occurring over an extended period of time, is not *1126 enough to entitle the claimant to compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.
Sparks, 546 So.2d at 147 (emphasis in original). Under the new law, it is not necessary to limit mental/mental claims through the accident requirement as was appropriately done under the old law in Sparks. The new law provided in subsection 1021(7)(b) supplies its own limitation by disallowing compensation for mental injuries unless they result from stress that, by its nature, is sudden, unexpected, and extraordinary in the usual course of employment in that working environment. Although the accident requirement must still be fulfilled as explained above, the limitation on claims should now be found in subsection 1021(7)(b).
In this case, Claimant personally found her demotion to be extraordinary and unexpected because she did not know that the bank was displeased with her management skills and she was quite settled in her career. Yet by its nature, a demotion for failing to satisfactorily perform one's job creates stress that is neither unexpected nor extraordinary in the usual course of employment at a bank. That is not to say that a demotion could not be handled in such a way that would make it unexpected or extraordinary. For example, if an employer used violence in demoting an employee, it would perhaps cause stress that is unexpected and extraordinary. In addition, an event such as a robbery would perhaps cause stress that is unexpected and extraordinary at a bank, regardless of how it is conducted. In this case, however, the bank explained to Claimant that it was demoting her to teller because she lacked managerial skills, and it is undisputed that the bank did so in a calm and professional manner. Such a situation does not create stress that is unexpected or extraordinary in the usual course of employment at a bank.
The court of appeal properly rejected a subjective test for evaluating subsection 1021(7)(b), but it concluded that the stress in this case was "sudden, unexpected, and extraordinary." The court considered the nature of Claimant's infraction (which the court characterized as a "mere[] attempt[] to correct a $5.00 error between two tellers") in light of the positive tenor of Claimant's personnel file and Claimant's thirteen years as a supervisor, and concluded that the demotion and salary cut was "far beyond what a reasonable person would expect as appropriate company discipline." Partin v. Merchants & Farmers Bank, 00-1113, p. 7 (La.App. 3 Cir. 5/9/01), 783 So.2d 652, 657. The court of appeal's analysis went beyond evaluating the nature of the stress into evaluating the wrongfulness or unfairness of the bank's personnel action, which is properly the subject of an action at tort law rather than a workers' compensation claim. A personnel action is not necessarily extraordinary because it is unfair from the employee's point of view. Although the court of appeal adopted an objective standard regarding subsection (7)(b), it nevertheless assessed the effect of the demotion from the Claimant's perspective when it considered her prior performance and her view of the five-dollar incident. Considering simply the nature of the stress itself in this case, we find that a demotion for lack of managerial skills creates stress that is neither unexpected nor extraordinary in the usual course of employment at a bank. We conclude, therefore, that Claimant's mental injury is not compensable under La. R.S. 23:1021(7)(b).

*1127 DECREE
For the foregoing reasons, the award in favor of Claimant is reversed.
REVERSED.
JOHNSON, J., concurs.
NOTES
[1] At the hearing, Claimant's supervisor, Kay Wilbanks, explained that forced-balancing means that the cash in a teller's drawer is intentionally manipulated in order to conceal the fact that the drawer is either short cash or over cash. In other words, a forced-balancing shows a false balance.