FREDERICKA HOMBERG WICKER, Judge.
 

 | P,In this workers’ compensation matter, Garda Security (formerly Vance Uniformed Protection Services, Inc.), defendant/appellant, appeals an Office of Workers’ compensation (OWC) judgment in favor of Beatrice Fleming, claimant/ap-pellee, awarding her temporary total disability indemnity benefits along with reasonable and necessary medical treatment. The OWC judge found that Ms. Fleming met her burden of proving by clear and convincing evidence that she suffered a mental stress injury as a result of an incident occurring in the course and scope of her employment on January 1, 2009. And, she concluded that the incident was a sudden, unexpected, and extraordinary event related to her employment as a security guard. Garda asserts that the OWC judge used the wrong standard in finding that Ms. Fleming met her burden of proof; and, Ms. Fleming failed to meet the requisite burden of proof. For the reasons that follow, we reverse. We render judgment dismissing Ms. Fleming’s claim with prejudice.
 

 Facts
 

 The circumstances of the incident are essentially undisputed.
 

 laOn early New Year’s January 1, 2009, Ms. Fleming was in the course and scope of her employment as a security guard for Garda Security. In 2005, when she was hired, Garda Security was then known as Vance International. Ms. Fleming worked
 
 *765
 
 for the company for 3-1/2 to 4 years. Ms. Fleming testified that she was trained as an unarmed security guard, and she once worked for Burns Security for almost two years. That evening she was working at her usual 1-1/2 year assignment: a guard shack located at a grain elevator plant in Paulina, Louisiana. Her 7:00 PM to 7:00 AM duties at the plant, ADM Chemical/Louisiana Grain, required her to “watch, observe, and report.” In essence, her duties involved watching persons who entered the plant entrance near the shack, signing them in, and signing them out. She was also required to observe anything unusual and report unusual activity to Ms. Iris Bryant, her supervisor.
 

 Something happened around 1:50 AM in that rural location that frightened and upset Ms. Fleming.
 

 Ms. Fleming testified “I was on my way out to the snack machine out the back door to go off to the snack machine” when she saw a driver of a gold car speed into the parking lot, stop under the only functioning light with the motor running, and shine the bright lights at the guard shack. The shack was 25 to 30 feet from the road. Ms. Fleming did not expect any vehicle to enter the lot because the plant was closed for the holiday. Added to her concern was the fact that she was alone in a closed plant where only one out of five nearby lights functioned and she had no working flashlight. Normally, the area was well-lit and Ms. Fleming was usually armed. This night she chose not to bring her gun. According to Ms. Fleming, the vehicle remained in that position for approximately 18 to 19 minutes Lbefore speeding out and onto the road. The person,
 
 [1]
 
 a male, never exited the vehicle.
 

 Because she was frightened and “freaked out,” Ms. Fleming did not follow the required procedure of approaching the vehicle and asking if the person needed assistance although she walked toward the car and waited for someone to come out. However, after observing the vehicle for five minutes, Ms. Fleming called and reported the activity to Ms. Bryant as required.
 

 Ms. Fleming asked Ms. Bryant to call the police. Ms. Bryant, however, did not call then and instructed Ms. Fleming to first call another supervisor, Ms. Tanya Becnel. According to Ms. Fleming, she told Ms. Bryant that she was unable to call the police. Doing so would have required Ms. Fleming to move from her hidden location in the shack into the driver’s view in order to use the desk phone in the shack. Although she had a phone on her person, she could not call out to 911.
 
 [2]
 

 Next, Ms. Fleming went to her jeep that was parked against the shack to retrieve, for her protection, a pipe from underneath the car seat. Ms. Fleming believed that the person thought she had a gun and so sped away.
 

 After the driver left, Ms. Fleming called Ms. Bryant again, this time to report that the car was gone. Ms. Bryant told her she was unable to reach Ms. Becnel.
 

 Although the vehicle was no longer there, Ms. Fleming was afraid it would return. She feared for her life and wanted to leave her post. Ms. Bryant told her she
 
 *766
 
 was on her way. Meanwhile, Ms. Fleming doused the light and remained in the locked guard shack. She continued to “freak out.”
 

 1 sAfter Ms. Bryant finally arrived, Ms. Fleming insisted that Ms. Bryant call the police.
 

 Deputy Toby Vicknair investigated the incident after he received the dispatch call around 3:00 AM. Ms. Fleming, who was visibly upset and crying, reported that she did not have the number for the police and she was too shaken to make the call. After leaving the scene, he gave Ms. Fleming a card with the sheriffs office number and advised her that perhaps the company could place that number or 911 on the inside of the guard shack for future reference.
 

 After the incident, Ms. Fleming sought treatment and did not return to her job. She testified that she is afraid that someone might “come up on her.”
 

 Before this incident, Ms. Fleming had treatment for preexisting mental problems, including hospitalization. For this incident, she received psychiatric as well as psychological evaluation and treatment from various professionals. She also received treatment from her family physician who prescribed antidepressants and anxiety medications.
 

 At the time of trial, Ms. Fleming was taking prescription medication prescribed by her psychiatrist, whom she sees regularly. She takes three drugs for psychosis, anxiety, and depression.
 

 The medical and psychological reports and depositions entered into evidence without objection reveal the following:
 

 Dr. John R. MacGregor, a psychiatrist, evaluated Ms. Fleming twice in April 2009. Dr. Marcia L. Philips, a psychologist, evaluated Ms. Fleming over a course of two days in December 2009. Dr. Kevin J. Bianchini, a psychologist and neuropsy-chologist, evaluated Ms. Fleming ' four times in September 2009.
 

 Drs. MacGregor and Philips diagnosed Ms. Fleming with post traumatic stress disorder (PTSD), DSM-IV-TR Code 309.81, as a result of her trauma from | nthe incident. Dr. Bianchini disagreed with that diagnosis. However, he diagnosed other mental illnesses based on the DSM diagnostic categories: depressive disorder or clinical depression, an anxiety disorder with clinically significant levels of anxiety, and a generic disorder reflecting psychotic problems. He concluded that depression and anxiety were related to multiple events, including Ms. Fleming’s perception of threat from the January 1, 2009 incident.
 

 Dr. Philips found Ms. Fleming was unable to resume work at the present time. She believed that Ms. Fleming needed treatment from a clinical psychologist, psychiatrist or a qualified mental health professional. She believed that Ms. Fleming’s treatment would be once or twice a week but she would want the treating clinician to make that specification. She stated she could not quantify either the period involved to succeed in treatment or the number of sessions.
 

 Dr. Philips also found additional diagnoses. In her opinion, Ms. Fleming was experiencing a major depressive episode, anxiety, and psychotic symptoms of a delusional and paranoid nature. Dr. Philips was aware that Ms. Fleming had previous psychiatric problems. And, the doctor was aware that Ms. Fleming exhibited numerous indications of anxiety. Ms. Fleming informed the doctor that she had been admitted three times before the incident for psychiatric treatment. Dr. Philips testified that persons with anxiety disorders have a predisposition for PTSD. If
 
 *767
 
 stressed, a person with a history of anxiety disorders is more likely to develop a strong reaction than someone who does not have a history of anxiety disorders.
 

 Dr. Phillips concluded that it was reasonable for Ms. Fleming to feel threatened given the January 1, 2009 incident. Particularly, Dr. Philips pointed out that there was no adequate lighting, a car speeded past the guard shack and shined 17its lights on the guard shack. She reported that in her opinion, Ms. Fleming was suffering from PTSD as a result of the January incident.
 

 Dr. Philips testified that she did not know whether it was more probable than not that an ordinary reasonable person with usual sensibility would find that the incident caused extraordinary stress sufficient to cause PTSD or other mental injury given a history without any prior mental problems.
 

 Dr. Bianchini testified that he spoke with Ms. Fleming about her prior history of mental illness or emotional problems. Ms. Fleming told him that a number of years ago she was depressed. She also told him that she had been hospitalized for psychiatric issues in 1993 or 1994 and that in those years she was treated at a mental health facility for depression but that she also had problems with hearing voices, a psychotic symptom. She told Dr. Bianchi-ni that she did take medication specifically because she was hearing voices. Ms. Fleming said that the medication helped with the voices and the depression. Dr. Bianchini opined that by history she had some very significant prior problems.
 

 He further explained that he did not make the specific PTSD diagnosis given the nature of the incident. PTSD typically involved such things as being physically harmed yourself or actually witnessing a horrific event that is outside the realm of normal experience. He stated that he thought a person could be frightened and upset about something but this was not the same as the kind of criteria for stimuli that he needed to reach to determine PTSD. Also, a diagnosis of PTSD required the ruling out of malingering or exaggeration and he could not rule that out.
 

 He was asked whether a normal person, who did not have Ms. Fleming’s experiences, including a history of psychosis, would experience this event sufficient to cause PTSD. He said the answer was “no.” When asked whether it could cause any other mental injury, he replied that someone could possibly ^become frightened and upset about that incident. But, he did not think the incident would cause a psychosis.
 

 Dr. Bianchini testified that he had concerns about the way Ms. Fleming viewed the events that happened. He said that under normal circumstances, in a person without Ms. Fleming’s prior history, which included psychosis, if a car pulled into the parking lot and flashed the lights and pulled away someone might typically have questions about what that was and wonder why that happened. But persons with a prior history of psychosis, like Ms. Fleming, have distortions about interpersonal events. He stated that Ms. Fleming’s pri- or psychosis could have colored her experiences of the event.
 

 Dr. Bianchini explained that Ms. Fleming thought that the person(s) were menacing her. However, menacing is not the same as serious or threatened injury. He explained that the person(s) did not drive the car as if he/they were going to hit her. He/they did not wave a gun out the window. He/they were only being menacing by sitting in the vehicle.
 

 In his opinion, a person without a preexisting psychosis or other mental injury, that is an ordinary person with the usual
 
 *768
 
 sensibilities, would not typically develop an anxiety disorder from the incident. It could make a person feel anxious at the time but he thought there was a low probability it would cause someone to have even persistent anxiety.
 

 The OWC judge concluded that the incident caused mental injury. And, the incident was sudden, unexpected and extraordinary stress that aggravated Ms. Fleming’s preexisting psychological condition.
 

 Analysis
 

 In a workers’ compensation case, as in other cases, the appellate court’s review is governed by the manifest error or clearly wrong standard.
 
 Freeman v. Poulan/Weed Eater,
 
 93-1530, p. 4 (La.1/14/94), 630 So.2d 733, 737. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 
 Seal v. Gaylord Container Corp.,
 
 97-0688 (La.12/02/97), 704 So.2d 1161, 1164 (citations omitted). Thus, if the judge’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 Id.
 
 Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.
 
 Ferrell v. Fireman’s Fund Ins. Co.,
 
 94-1252 (La.2/20/95), 650 So.2d 742, 743 (citations omitted).
 

 Ms. Fleming claimed a mental injury caused solely by mental stress. Such a claim is commonly known as a “mental/mental” claim.
 
 [3]
 
 A worker in a compensation action must establish “personal injury by accident arising out of and in the course of his employment.”
 
 Ardoin v. Firestone Polymers, L.L.C.,
 
 10-0245, p. 3 (La.1/19/11), 56 So.3d 215 quoting La.RS. 23:1031(A). Furthermore, a mental/mental claimant must fulfill both the requirements of La.RS. 23:1031(A) and La.R.S. 23:1021(8)(b) and (c). La.R.S. 23:1021(8)(b) and (c) provide:
 

 (b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
 

 | m(c) Mental injury caused by physical injury. A mental injury or illness caused by a physical injury to the employee’s body shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence.
 

 (d) No mental injury or illness shall be compensable under either Subparagraph (b) or (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
 

 Under the statute, a mental injury is compensable depending upon the type
 
 *769
 
 of stress which triggers that injury.
 
 Partin v. Merchants & Farmers Bank,
 
 01-1560, p. 12 (La.3/11/02), 810 So.2d 1118, 1125. The legislature intended that the nature of the stress itself be evaluated, rather than the stress being evaluated from the employee’s perspective.
 
 Id.
 
 (citations omitted). This of course differs from the determination of whether an “event” was unexpected or unforeseen under the accident requirement of subsection 1021(1), which is made by viewing the event from the employee’s perspective.
 
 [4]
 

 Id.
 

 This different evaluation of the “stress” under subsection 1021 (8)(b) is mandated by the legislative intent.
 
 [5]
 

 Id.
 
 If the stress were evaluated from the employee’s perspective, much wider recovery would result under subsection (8)(b) because nearly every employee would consider extraordinary a stress that caused him mental injury. Although Louisiana courts have construed the terms of the Workers’ Compensation Act liberally in light of its purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce, there is a legislative intent to the contrary in subsection | n(8)(b).
 
 Id.
 
 (internal quotation marks omitted). The most likely inference is that the legislature intended to restrict recovery under subsection (8)(b) to those mental injuries that result from stresses which, by their nature, are sudden, unexpected, and extraordinary in the usual course of employment in that working environment.
 
 Id.,
 
 12-13, 810 So.2d at 1125.
 

 Under R.S. 23:1021(8)(b), a mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compen-sable unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
 
 Id.
 
 at 11, 810 So.2d at 1124.
 

 The mental injury must have been caused by an unexpected and unforeseen event that occurs suddenly or violently. The extraordinary nature of the stress is determined from the point of view of the ordinary reasonable person of usual sensibilities, not from the point of view of the claimant. The claimant cannot merely show that a mental injury is related to the general conditions of employment, or to incidents which have occurred over an extended period of time.
 
 Tranchant v. Environmental Monitoring Service, Inc.,
 
 00-1160 (La.App. 5 Cir. 12/13/00), 777 So.2d 516, 519 (citations omitted).
 

 Preexisting disease or infirmity of the employee does not disqualify a claim if the work-injury aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed.
 
 Walton v. Normandy Village Homes Association, Inc.,
 
 475 So.2d 320, 324 (La.1985).
 

 
 *770
 
 Garda argues that the trial judge used an improper legal standard by relying on personal experience and equating Ms. Fleming’s experience with that of a lonely woman in a rural unlit area as opposed to the ordinary person with ordinary sensibilities. It argues that a security guard should expect persons might come to [1Pthe closed facility; otherwise there would be no need for a security guard. Garda contends that the stress was not extraordinary given the absence of any hostile or aggressive action. Garda also contends that the judge was manifestly erroneous. Ms. Fleming responds that the judge applied the proper standard and was not manifestly erroneous. In addition, Ms. Fleming argues that there was no evidence that Ms. Fleming was even trained for the event she encountered. We agree with Garda’s contention that there is legal error and reverse the OWC judge.
 

 In this case, the OWC judge was mindful of the above requirements for proving mental injury. She was also mindful that the event must be viewed objectively rather than subjectively from the employee’s viewpoint. But even so, the OWC judge failed to apply the requisite test that the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment as viewed from an objective standard.
 

 Ms. Fleming’s testimony was undisputed that one of her duties at that rural location for 1-1/2 years was to report unusual activity. Given the nature of her security guard job, she was hired to report such activity as occurred on January 1, 2009. She testified that she was also required, if a person remained too long, to ask if they required assistance. Because she was frightened, she chose instead to contact her supervisor. The person or persons in the car never threatened Ms. Fleming with any violence.
 

 The OWC judge concluded that this was a sudden, unexpected, and extraordinary event even for a security guard. She opined that for a woman alone in a rural area, it was unusual for a car to race into the lot and shine its lights in the middle of a holiday night when the plant was closed. She noted that Dr. Bianchini stated that someone could become frightened and upset under the circumstances. She also noted that Dr. Phillips also testified that it was reasonable for an employee | ,3to feel threatened by the incident. However, Dr. Phillips stated that she did not know whether it was more probable than not that an ordinary reasonable person with usual sensibility would find that the incident caused extraordinary stress sufficient to cause PTSD or other mental injury.
 

 Dr. Bianchini was able, however, to give an expert opinion. In his opinion, an ordinary person with the usual sensibilities would not typically develop an anxiety disorder from the incident. It could make a person feel anxious at the time but he thought there was a low probability it would cause someone to have even persistent anxiety.
 

 We find that, even under the facts as presented by Ms. Fleming, the incident does not fit the meaning of unexpected and extraordinary stress under subsection (8)(b).
 

 In
 
 Partin, supra,
 
 01-1560 at 14, 810 So.2d at 1126, the claimant sought workers’ compensation benefits for an alleged mental injury occurring during the course of her demotion at a bank. The Louisiana Supreme Court concluded that by its nature, a demotion creates stress that is neither unexpected nor extraordinary in the usual course of employment at the bank. The demotion, which was handled in a calm manner, did not produce extraordinary stress.
 

 
 *771
 
 Similarly, Ms. Fleming’s duties as a security guard involved reporting unusual activity and inquiring if a person needed assistance. Thus, by its nature, a car speeding into the lot with the driver sitting there created stress that was neither unexpected nor extraordinary in the usual course of Ms. Fleming’s employment as a security guard.
 

 In
 
 Delrie v. Peabody Magnet High School,
 
 10-40 (La.App. 3 Cir. 6/2/10), 40 So.3d 1158, 1160, 1161, the Third Circuit affirmed the OWC judge’s finding that the claimant failed to meet her burden of proving a mental injury resulting |14from employment as a schoolteacher. In that case, a student perpetrated a hoax by claiming that people were shooting inside the school. The court found that while the claimant might have found the event to be extraordinary and violent, the record indicated that other persons, including students, who were present during the joke, found the joke to be obvious. In addition, both psychologists involved in the matter found the claimant to be more susceptible to PTSD than normal due to her history.
 

 Here, no one witnessed the incident. However, similar to
 
 Delrie,
 
 Dr. Phillips and Dr. Bianchini both agreed that Ms. Fleming was susceptible to reacting differently to the situation than someone without her mental history.
 

 Although the OWC judge adopted the objective standard, she nonetheless assessed the effect of the incident from Ms. Fleming’s perspective.
 

 We find that the judge erred as a matter of law in failing to use the objective standard. This error of law requires us to conduct a de novo review of the record and to render a judgment on the basis of our review of the facts.
 

 Upon de novo review, we conclude for the reasons stated above, that under the objective standard, the judgment must be reversed.
 

 Conclusion
 

 Accordingly, the compensation judgment rendered in favor of claimant Beatrice Fleming and against defendant/appellant, Garda Security (formerly Vance Uniformed Protection Services, Inc.), is reversed. Based on the reasons set forth in this opinion, we render judgment dismissing claimant’s case against Garda Security (formerly Vance Uniformed Protection Services, Inc.) with prejudice.
 

 REVERSED AND RENDERED.
 

 [1]
 

 . It is unclear from the record whether Ms. Fleming spotted more than one person in the car. At times, she referred to "he,” while at other times, she referred to "they.”
 

 [2]
 

 . The employer disputes Ms. Fleming’s statement that she could not call 911. Defense counsel, in brief to this Court, relies in part on an unsigned letter reportedly from Ms. Becnel that was introduced into evidence without objection. The letter relates that Ms. Fleming should have called 911 if she felt threatened.
 

 [3]
 

 .
 
 Partin v. Merchants & Farmers Bank,
 
 01-1560, p. 7 (La.3/11/02), 810 So.2d 1118, 1122.
 

 [4]
 

 . That subsection defines "accident” as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration."
 

 [5]
 

 . Prior to the 1997 amendments, Section 102 l(8)(e) was designated as Section 102 l(7)(e). The content of this section was unchanged, and references in some decisions to the earlier citation should be understood as referencing the current Section 1021(8)(e).
 
 Lloyd v. Shady Lake Nursing Home, Inc.,
 
 45,-180, 5, n. 4 (La.App. 2 Cir. 8/25/10), 47 So.3d 609, 613, n. 4.