JUDE G. GRAVOIS, Judge.
12AppeIIant/empIoyer, Paretti Imports, Inc. (“Paretti”), appeals a judgment rendered by the Office of Workers’ Compensation, District 7, awarding claimant/employee, Christopher Darwin (“claimant”), workers’ compensation benefits for psychological injuries sustained in a 2009 work-related accident, awarding claimant supplemental earnings benefits (“SEB”) from September 13, 2011 to December 1, 2011, and finding that claimant’s post-injury earning capacity was 50 percent of his pre-injury wages. Claimant answered the appeal, challenging the finding that claimant’s entitlement to SEB terminated on December 1, 2011. For the reasons that follow, we amend and affirm.

FACTS

On September 9, 2009, claimant, an automotive technician employed by Paretti, fell from a raised vehicle onto a concrete surface. Attempting to brace his fall, claimant extended his left arm in a “stiff arm” fashion and landed on his left palm. Claimant is left-handed. He initially experienced pain in his left elbow and received treatment the next day at East Jefferson General Hospital Occupational ^Medicine Clinic, where he was X-rayed, placed in a sling, and referred to an orthopedist. Around this time, in addition to the pain in his elbow, claimant began experiencing numbness in the ring and pinky fingers of his left hand. On September 14, 2009, Dr. Harold Stokes, the orthopedist, determined that claimant had sustained a radial head fracture to his left elbow, requiring surgery, which he performed the following day.
Following claimant’s recuperation from the surgery, on December 1, 2009, Dr. Stokes approved claimant’s return to work on full duty. Upon claimant’s return to work, Craig Diebold, Paretti’s service *1267 manager, observed a decline of about 50 percent in claimant’s productivity, which he expected, as it would take time for claimant to re-acclimate himself to the physical rigors of the job, as well as learn new technical updates that occurred in his absence. However, claimant soon complained of discomfort in his left elbow, prompting Dr. Stokes to order a functional capacity evaluation (“FCE”), which was performed on February 1 and 8, 2010. The evaluation determined that claimant was capable of performing the work of a mechanic, but incapable of the lifting as claimant stated was required by his job. Based on claimant’s continued complaints of pain, a CT scan of his left elbow was conducted, which suggested the possibility that his fracture had not united. Claimant opted for surgery, which Dr. Stokes performed on April 20, 2010, wherein he replaced a portion of claimant’s left elbow joint with a prosthesis.
In June of 2010, claimant met with a clinical social worker, Anjeanne Weiss, complaining of stress, anxiety, depression, and trouble at work, among other things. Ms. Weiss referred claimant to another clinical social worker, Paul Shurte, for further therapy.
Meanwhile, upon claimant’s return to work following his second surgery, Mr. Diebold noticed an even further decline in claimant’s productivity, which he |4attributed to a lack of motivation on claimant’s part: “[I]t was like he just wasn’t motivated to get the next job. He wasn’t coming to pull the tickets.” “He would spend a lot of time sitting by his tool box and there was [sic] jobs stacking up. He just didn’t go get them.” Brian La-coste, the shop foreman, had a different assessment of the situation, testifying that upon claimant’s return to work after his injury, he put forth good effort and it was evident that he was trying. Additionally, claimant acknowledged that he was “sitting around some of the time,” but he explained this was on account of slow business: “When work does get slow on occasion, we go on basically a list for work.... [Y]ou have your name put on a list and as work comes in, they call you to come get it.”
Claimant again experienced discomfort in his left elbow and complained of numbness in the pinky and ring fingers of his left hand. On July 28, 2010, Dr. Stokes found irritation in claimant’s ulnar nerve, for which he recommended neurological testing. On August 5, 2010, a neurologist, Dr. Hugh Fleming, performed tests and found “moderate ulnar nerve slowing across [claimant’s] left elbow.” Over the next several weeks, the numbing sensation worsened, prompting Dr. Stokes to recommend surgery.
Prior to claimant’s third surgery, Elier Diaz, a vocational rehabilitation counselor, was retained on July 29, 2010 to assist claimant in overcoming his mental and physical disabilities in order to maximize his vocational potential. Also, on August 6, 2010, claimant met with the clinical social worker, Mr. Shurte, and continued to see him on a weekly basis for psychotherapy. After a couple of meetings, Mr. Shurte diagnosed claimant with “major depression” and recommended a psychiatric evaluation. Claimant met with a psychiatrist, Dr. John Bick, on September 1, 2010. Dr. Bick diagnosed claimant with “severe major depressive disorder,” recommended that he continue psychotherapy, and prescribed medication for him.
| ^Claimant underwent his third surgery on September 21, 2010. On December 20, 2010, Dr. Fleming performed neurological testing and found “marked improvement” in the condition of claimant’s ulnar nerve, a conclusion disputed by claimant who continued to experience numbness. On December 27, 2010, Dr. Stokes released *1268 claimant to limited duty and restricted him to lifting no more than fifty pounds. Mr. Diebold and Mr. Lacoste testified that based on this fifty-pound restriction, there were no jobs in the shop that claimant was physically incapable of performing. They explained the heaviest object a mechanic would be required to lift without assistance is a rim and tire, which weighs approximately 30 to 40 pounds.
Sometime after claimant’s third surgery, in addition to the lingering pain in his left elbow and numbness in his fingers, claimant experienced pain radiating down from his neck. Believing he had a pinched nerve in his neck, claimant sought treatment from a chiropractor.
There is chronological confusion regarding claimant’s chiropractic treatment. The record indicates that claimant received chiropractic treatment for his neck on January 28, 2011. However, the record also reflects that a week before that, on January 21, 2011, in a meeting with Mr. Shurte, claimant informed Mr. Shurte that he had visited a chiropractor and that X-rays showed compressed disks in his neck. Furthermore, the record indicates that at claimant’s visit with Dr. Stokes on January 27, 2011, he informed Dr. Stokes of this chiropractic treatment. Despite this confusion, it is apparent that Mr. Shurte’s notes of January 21, 2011 are the first documented complaint of claimant’s neck pain.
Dr. Stokes, who had no prior knowledge of claimant’s neck pain, did not believe it was causally related to claimant’s September 9, 2009 injury. On February 3, 2011, claimant requested that Dr. Stokes fax a cervical MRI order to his workers’ compensation carrier for approval. On account of claimant’s | ficomplaints of neck pain, Dr. Stokes felt a cervical MRI was appropriate and so faxed a recommendation therefor.
On March 10, 2011, claimant underwent a second functional capacity evaluation, in which he demonstrated an ability to return to work as a mechanic with a limitation on his left arm to medium level work. One notable restriction recommended by the FCE was for claimant to avoid the repetitive lifting of more than 35 pounds from the ground. Following a meeting with Dr. Stokes on April 6, 2011, the doctor approved claimant’s return to work subject to the limitations as outlined in the FCE. On May 9, 2011, after reviewing Paretti’s automotive technician manual, Dr. Stokes determined the job requirements were physically appropriate for claimant from an orthopedic standpoint. Also on May 9, 2011, Dr. Bick, after reviewing Paretti’s automotive technician manual, determined the job requirements were appropriate for claimant from a psychiatric standpoint.
On June 6, 2011, claimant visited Dr. Eric Ehlenberger[1] and requested a cervical MRI, which the doctor ordered that day. The cervical MRI was conducted on June 9, 2011.
Following Dr. Stokes’ and Dr. Bick’s approvals of claimant’s return to work, claimant returned on June 29, 2011. Mr. Diebold again observed the same level of decreased productivity. Several weeks later, on July 19, 2011, claimant, Mr. Diaz, and Mr. Diebold met to assess claimant’s return to work. At this meeting, claimant expressed satisfaction with his employer’s efforts to render the work environment suitable for him; Mr. Diebold likewise expressed satisfaction with claimant’s efforts in regard to his job duties. Also at this *1269 meeting, claimant reported one instance where he did not receive the necessary assistance, but this was determined to be an unusual circumstance due to the shop foreman’s absence.
|7On August 22, 2011, claimant, Mr. Diaz, Mr. Diebold, and Mr. Lacoste met again to assess claimant’s progress, wherein claimant again expressed satisfaction with the assistance he was receiving. Indeed, Brandon Vail, a fellow mechanic, and Mr. Lacoste both testified that they assisted claimant. Mr. Lacoste and Mr. Diebold stated that there was always someone availablé to lend assistance. Claimant acknowledged that he received assistance from his co-workers “maybe half the time.”
However, at the next meeting on September 12, 2011, Mr. Diaz met with claimant, his wife, and an assistant of claimant’s attorney, wherein claimant revealed that prior to their August 22 meeting, Mr. Die-bold, Mr. Lacoste, and two other individuals, Craig Paretti, the owner, and Joseph Salinas, the accountant, met with claimant in Mr. Diebold’s office. According to claimant, these four men told claimant to go along with whatever Paretti’s representatives would say at the next meeting with Mr. Diaz or else things would not go well for him on the job.
Claimant also informed Mr. Diaz that he had been the target of pranks and verbal abuse since his return to work. He explained to Mr. Diaz that the lock on his toolbox had been superglued, that he received a note stating he would be fired for faking an injury, and that he had been called derogatory names by some of his coworkers.
Claimant further informed Mr. Diaz that there are various tasks with his job which require him to contort his left arm in a manner such that it causes significant pain and prevents him from performing his job duties. This even occurs when claimant is not lifting an object over fifty pounds. At trial, claimant reiterated this, testifying that he was still “[un]able to perform [his] job up to what [he] was really expected to do,” struggling to lift objects over thirty pounds.
On September 15, 2011, Mr. Diebold and Mr. Lacoste met with Mr. Diaz, wherein they denied that any meeting had occurred with claimant, Mr. Paretti, and 18Mr. Salinas, or that any threats had been made. Again at trial, Mr. Diebold and Mr. La-coste reiterated their denial of the meeting with claimant, Mr. Paretti, and Mr. Salinas. Mr. Diebold and Mr. Lacoste also denied knowledge of the superglue incident, and explained that the note was a practical joke of which claimant was, not the only recipient. They also explained that the atmosphere in the shop is jocular, where technicians constantly tease one another and use Amigar language.
This was corroborated by testimony at trial, where Mr. Diebold, Mr. Lacoste, Mr. Vail, and claimant himself described the atmosphere of the shop as jocular. Everyone participated in cursing and practical jokes, including claimant. And claimant’s three co-workers testified that this atmosphere did not change after claimant’s injury and that claimant continued to participate in the jocularity.
Mr. Vail elaborated on the note prank, explaining that he placed notes in the tool boxes of four mechanics, including claimant, informing each mechanic that he would be fired. One note read: “You’ll be fired for living on the Westbank.” A second: “You’ll be fired. You didn’t laugh.” A third: ‘You’ll be fired. I found you sleeping in the car again.” And claimant’s note read: ‘You’ll be fired for fake injury.” According to Mr. Diebold, Mr. Lacoste, and Mr. Vail, this was perceived as a joke about which everybody laughed and about which there were no complaints. In fact, *1270 Mr. Diebold testified that claimant told him he knew the note was a joke.
On September 13, 2011, Dr. Biek found claimant “was getting more depressed [and] more anxious,” and so ordered claimant to cease working with Paretti. He explained that claimant’s psychiatric state did not prevent him from working as a mechanic, but only from working with Par-etti.
After leaving the employ of Paretti, claimant, with the assistance of Mr. Diaz, began searching for other job opportunities consistent with claimant’s educational, vocational, and physical abilities, as well as within his geographical |9area. Mr. Diaz identified the first full-time job fitting these parameters on November 30, 2011, which Dr. Stokes approved on December 1, 2011. This job paid a wage of $30.00 per hour.[2] Claimant testified that he applied for this job but was not hired.
On December 8, 2011, claimant visited another psychiatrist, Dr. Richard Roniger, who diagnosed him with “Adjustment Disorder,” which the doctor believed to be related to claimant’s September 2009 accident and subsequent surgical procedures. Dr. Roniger also diagnosed claimant with “Occupational Problem,” which he attributed to claimant’s situation with his coworkers.
On January 18, 2012, the workers’ compensation judge (“WCJ”) appointed Dr. Harold Ginzburg as an independent medical examiner in the field of psychiatry to examine claimant. Dr. Ginzburg evaluated claimant on March 10, 2012, diagnosed him with “adjustment disorder with mixed anxiety and depressed mood,” and concluded that “[t]here is no psychiatric/behavioral health reason why [claimant] should not immediately return to the workplace....”

PROCEDURAL HISTORY

On March 7, 2011, claimant filed a disputed compensation claim, Form 1008, with the Office of Workers’ Compensation (“OWC”), disputing the non-authorization of Dr. Stokes’ cervical MRI recommendation. On March 21, 2011, Paretti filed its answer to claimant’s compensation claim, in which it denied claimant’s neck injury was a result of a work accident and refused to compensate claimant for the treatment thereof.
On October 31, 2011, claimant was permitted to supplement his disputed compensation claim with the addition of his psychological injury and treatment, for which he sought compensation.
11 nTrial was held on October 3, 2012, following which, on December 21, 2012, the WCJ issued a judgment, finding that:
(1) claimant injured his left elbow, arm, and fingers on September 9, 2009;
(2) claimant suffered psychological as well as physical injuries from the accident;
(3) claimant failed to establish a causal connexity between his cervical injury and the accident;
(4) claimant is entitled to temporary total disability benefits for his left arm, elbow, and finger injuries, and psychological injuries from September 9, 2009 through September 12, 2011, for any time period that he was not working;
(5) claimant is not entitled to any workers’ compensation benefits for his cervical injury;
(6) claimant is entitled to SEB after September 13, 2011, when he stopped working for Paretti when he earned less than 90 percent of his pre-injury wages;
*1271 (7) claimant is entitled to payment of all medical expenses, medication expenses, and transportation expenses for his left arm, elbow, and finger injuries, and psychological injuries;
(8) Paretti will be given credit for all workers’ compensation benefits, which were paid in accordance with law; and
(9) no penalties or attorney’s fees are assessed, other than the statutory attorney’s fees.
On January 2, 2013, claimant filed a motion for a new trial in which he requested a new trial for the limited purpose of specifying the SEB compensation amount. Claimant sought to have the WCJ specify whether he was determined to have any earning capacity, and if not, to specify a “zero earning capacity.”
On January 7, 2013, Paretti filed a motion for a new trial to address:
(1) whether, and to what extent, claimant is entitled to temporary total disability benefits for his left arm, elbow, finger, and psychological injuries from September 9, 2009 through September 12, 2011;
(2) whether, and to what extent, claimant is entitled to SEB after September 13, 2011; and
(3) whether claimant is entitled to payment of all medical, medication, and transportation expenses for psychological injuries.
| nA hearing on the motions for a new trial was held on February 8, 2013, following which, on March 14, 2013, the WCJ ordered the motions granted solely for the limited issue of determining claimant’s earning capacity for the calculation of SEB. On April 8, 2013, the WCJ supplemented her previous ruling and denied Paretti’s motion for a new trial on the issues of temporary total disability benefits between September 9, 2009 and September 12, 2011, and the award of medical benefits for psychological injuries.
The “new trial” was held on May 6, 2013, following which, on May 17, 2013, the WCJ issued a judgment, finding that:
(1) claimant is entitled to SEB from September 13, 2011 through December 1, 2011;
(2) claimant’s earning capacity is calculated at 50 percent of his pre-injury wages;
(3) claimant’s monthly SEB rate is $1,455.70;
(4) claimant has failed to prove his inability to earn 90 percent of his average monthly pre-injury wages after December 1, 2011;
(5) suitable jobs were identified and approved for claimant, effective December 1, 2011; and
(6) claimant is not entitled to any SEB after December 1, 2011.
On June 7, 2013, the WCJ granted Par-etti a suspensive appeal relative to the rulings of December 21, 2012 and May 17, 2013. On September 13, 2013, claimant filed an “Answer to Appeal,” in which he sought an appeal from the WCJ’s findings that:
(1) claimant was only entitled to SEB from September 13, 2011 to December 1, 2011;
(2) claimant has failed to prove his inability to earn 90 percent of his average monthly pre-injury wages after December 1, 2011;
(3) suitable jobs were identified and approved for claimant effective December 1, 2011; and
(4) claimant is not entitled to any SEB after December 1,2011.
*1272 | ^ASSIGNMENTS OF ERROR ON APPEAL
On appeal, Paretti assigns the following errors:
(1) the WCJ erred in awarding benefits for psychological injuries sustained in the 2009 accident;
(2) the WCJ erred in finding that claimant suffered a “mental/mental” injury;
(3) the WCJ erred in finding claimant was entitled to SEB from September 13, 2011 to December 1, 2011;
(4) the WCJ erred in finding that claimant’s earning capacity is calculated at 50 percent of his pre-injury wages; and
(5) the WCJ erred in finding claimant is entitled to temporary total disability benefits.[3]
Additionally, claimant raises the following assignment of error on appeal:
(1) the WCJ erred in finding that claimant’s SEB terminated on December 1, 2011.

PARETTPS ASSIGNMENT OF ERROR NUMBER ONE

In its first assignment of error, Paretti argues that the WCJ erred in awarding claimant workers’ compensation benefits for a psychological injury sustained in the September 9, 2009 accident. Paretti asserts that claimant failed to prove his psychological injury was caused by the accident and so was not entitled to compensation benefits therefor.
To be entitled to workers’ compensation benefits, the claimant must prove that there was a work-related accident, resulting in a disability that was caused by the accident. McCray v. Intralox, Inc., 07-1036 (La.App. 5 Cir. 5/27/08), 987 So.2d 267, 270-71. The claimant bears the burden of establishing this causal connection by a reasonable preponderance of the evidence. Id. at 271. Yet, in the case of mental injury, as is at issue here, the claimant’s burden of proof is heightened to the standard of clear and convincing evidence. La. R.S. 23:1021(8)(c) provides: “A mental injury or illness caused by a physical injury to the employee’s body shall not be considered a personal injury by accident arising 11sout of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence.” In addition, the mental injury must be “diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition [must meet] the criteria as established in the most current issue of the Diagnostic and Statistical Manual [“DSM”] of Mental Disorders presented by the American Psychiatric Association.” La. R.S. 23:1021(8)(d).
The determination of whether an employee is entitled to workers’ compensation benefits is based on the facts and circumstances of each case, considering that the laws governing workers’ compensation must be construed liberally in favor of the employee. McCray, supra. Plus, in workers’ compensation cases, the appellate court’s review is governed by the manifest error or clearly wrong standard. Fleming v. Garda Sec., 10-1021 (La.App. 5 Cir. 5/10/11), 65 So.3d 763, 768. Under this standard, this Court may only reverse a WCJ’s factual determination if we find from the record that a reasonable factual basis for the finding does not exist and the finding is manifestly erroneous. Chauvin v. Terminix Pest Control, Inc., 11-1006 *1273 (La.App. 1 Cir. 6/28/12), 97 So.Sd 476, 482. Where two permissible views of the evidence exist, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the fact-finder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review where conflict exists in the testimony. Id. In reviewing the factual findings of the trial court, the appellate court does not retry the case, does not make credibility decisions, and does not make conclusions and draw inferences from the factual and credibility determinations. That is the role of the trial court. Id.
114In the instant case, it is beyond dispute that claimant injured his left elbow in a-work-related accident on September 9, 2009. The WCJ made this factual finding, as well as found that claimant suffered a mental injury caused by his work-related accident. Paretti disputes this latter finding, but we find there exists in the record a reasonable factual basis supporting this conclusion.
Dr. John Bick, claimant’s treating psychiatrist, diagnosed claimant with severe major depressive disorder and found this bore a direct causal relation to claimant’s September 2009 accident. He explained: “[Claimant] had feelings of worthlessness because he was unable to work. His work had always been important to him as a source of self-esteem, and it seems that the overwhelming probability is that his depression and anxiety were related to the accident.” Dr. Bick further testified that his diagnosis of claimant’s condition was based on his determination that claimant’s symptoms met the criteria for the condition as established in the “DSM-IV-TR,” which, at the time of Dr. Bick’s diagnosis, was the latest edition of the DSM. Additionally, Dr. Roniger found claimant’s “Adjustment Disorder” was related to his September 2009 accident and subsequent surgical procedures.
In light of Dr. Bick’s and Dr. Roniger’s testimony, we find there was a reasonable factual basis for the WCJ’s determination that claimant’s mental injury was caused by the injury he sustained in his workplace accident on September 9, 2009. The WCJ did not manifestly err in this determination. This assignment of error is without merit.

PARETTI’S ASSIGNMENT OF ERROR NUMBER TWO

In its second assignment of error, Paret-ti argues that the WCJ erred in finding that claimant suffered a “mental/mental” injury[4] caused by workplace | ir,harassment, thus entitling him to workers’ compensation benefits beginning on September 12, 2011. Claimant responds that he neither claimed a “mental/mental” injury, nor did the WCJ award benefits therefor.
A review of claimant’s original and supplemental disputed compensation claims reflects that he did not seek benefits for a “mental/mental” injury caused by workplace harassment. Further, the WCJ’s judgments do not reflect that claimant was awarded benefits for a “mental/mental” in *1274 jury caused by workplace harassment. This assignment of error is without merit.

PARETTI’S ASSIGNMENT OF ERROR NUMBER THREE AND CLAIMANT’S ASSIGNMENT OF ERROR

In its third assignment of error, Paretti argues that the WCJ erred in awarding claimant SEB from September 13, 2011 until December 1, 2011. Paretti contends that claimant is not entitled to SEB beyond September 13, 2011 because he left Paretti’s employ on account of workplace harassment, not his work-related injury, and because claimant was able to earn at least 90 percent of his pre-injury wages. In his only assignment of error, claimant argues that the WCJ erred in finding that his SEB terminated on December 1, 2011. Since these assignments of error are interrelated, they are discussed together.
The purpose of SEB is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. Poissenot v. St. Bernard, Parish Sheriff’s Office, 09-2793 (La.1/9/11), 56 So.3d 170, 174 (quotation omitted). An employee is entitled to receive SEB if he sustains a work-related injury that results in his inability to earn 90 percent or more of his average pre-injury wage. Id. (citing La. R.S. 23:1221(3)(a)). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in llfihis inability to earn that amount under the facts and circumstances of the individual case. Id. If the employee meets this initial burden, it then shifts to the employer to prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer’s community or reasonable geographic location. Id. (citing La. R.S. 23:1221(3)(c)(i)).
The employee’s initial burden implicitly requires the employee to show that the injury, and not some other cause, resulted in his inability to retain his pre-injury job. Poissenot at 176. Where the employee goes back to his pre-injury job and then is terminated for a reason beyond the employer’s control and totally unrelated to the injury, this strongly suggests that his inability to earn 90 percent of his pre-injury wages was not the result of his injury and that the employee is in fact able to earn 90 percent of his pre-injury wages in some capacity. Id. The trial court, in determining if an injured employee has upheld his burden, may and should take into account all those factors which might bear on an employee’s ability to earn a wage. Id. at 174. This Court has recognized an injured employee’s testimony that he is no longer able to return to his pre-injury employment, without more, is insufficient to prove entitlement to SEB. See Wilson v. Metro. Dev. Ctr., 12-487 (La. App. 5 Cir. 3/13/13), 113 So.3d 261, 266.
In Poissenot, supra, the Louisiana Supreme Court reversed a court of appeal’s upholding a WCJ’s award of SEB to the claimant upon the basis that both the WCJ and appellate court applied the incorrect standard in determining whether the claimant had met his initial burden of proof. Id. at 175. The supreme court found that the lower courts had mistakenly focused on whether the claimant could return to the same type of work he was performing before the accident, rather than whether the claimant could earn 90 percent of his pre-injury wages. Id. The court stressed that the workers’ compensation statute clearly places its focus on the |17amount of wages earned before and after the accident, not the type of occupation or the type of work performed. Id. With this standard in mind, the court examined all the evidence that bore upon the claimant’s inability to earn 90 percent or more of his *1275 pre-injury wages and determined that the claimant did not meet his initial burden. In reaching this determination, the court found there was a lack of evidence supporting the claimant’s inability to earn 90 percent or more of his pre-injury wages. Id. at 175-79.
Of significance, the court found there was no medical evidence supporting the claimant’s position. Poissenot at 178. The court noted that both the functional capacity evaluation and the claimant’s doctor cleared him to return to medium level work, the level at which his pre-injury job was rated. The court also noted that although the claimant complained of pain, he rated it at a level of two on a ten-point scale, which his doctors evidently did not feel prevented him from returning to medium level work. Id. at 177-78.
Turning to the instant case, we first consider whether claimant bore his initial burden of proving by a preponderance of the evidence that he sustained a work-related injury that resulted in his inability to earn 90 percent or more of his average pre-injury wages. We begin this inquiry by noting that claimant’s pre-inju-ry wages were a weekly average of $1,017.00.[5] From this, we find claimant’s average monthly wages prior to his injury were $4,407.00.[6] Therefore, claimant was required to prove by a preponderance of the evidence that his injury resulted in his inability to earn at least $8,966.30 per month.[7]
In reviewing the WCJ’s determination that an employee has discharged his burden of proof, this Court is bound by the manifest error standard of review. Chau-vin, 97 So.Bd at 481-82. And, in determining whether a WCJ manifestly 11serred in finding that an injured employee bore his initial burden, as we are tasked with here, we must examine all evidence that bears upon the employee’s inability to earn 90 percent or more of his pre-injury wages. Poissenot at 174. With these precepts in mind, we now turn to the facts at hand.
Following claimant’s unsuccessful first surgery, he underwent a functional capacity evaluation in February 2010, which found that claimant demonstrated strength in the “medium” level category, corresponding with the Department of Labor’s rating of an automotive mechanic. The FCE concluded that while claimant displayed the strength consistent with the classification of his job, his displayed strength was not consistent with the lifting as he stated was required by his job. Claimant reported that the essential functions of his job include the handling of differentials approximately weighing at or above 100 pounds and wheels approximately weighing 80 to 40 pounds. This description was, in part, corroborated by the testimony of Mr. Diebold and Mr. Lacoste, who both estimated that the heaviest object a mechanic would be required to lift without assistance is a rim and tire, which weighs approximately 30 to 40 pounds. With respect to differentials, Mr. Diebold explained they can weigh up to 180 pounds, but a mechanic is not required to lift a differential without assistance.
Additionally, on the second day of testing, the FCE noted that claimant displayed increased blood pressure, increased complaints of pain, decreased functional performance, and decreased range of motion and strength in his left elbow. *1276 Throughout the two-day evaluation, claimant rated his lowest level of pain at three and his highest at seven, on a ten-point scale.
Claimant’s second surgery was conducted on April 20, 2010. This proved to be ineffective as Dr. Stokes subsequently found irritation in claimant’s ulnar nerve, which was also confirmed by the neurologist, Dr. Fleming, who noted “moderate ulnar nerve slowing across [claimant’s] left elbow.” This led to claimant’s third 113surgery in September of 2010, following which Dr. Fleming found “marked improvement” in the condition of claimant’s ulnar nerve, a conclusion disputed by claimant who continued to experience numbness. In December of 2010, Dr. Stokes released claimant to limited duty and restricted him to lifting no more than fifty pounds.
Then, in March of 2011, claimant underwent his second functional capacity evaluation, which found that he again demonstrated strength in the medium level category. The FCE also determined that claimant’s “subjective complaints concerning his left elbow appeared to be reasonable based on his medical history and demonstrated ability.” Of note, the FCE indicated that when performing two consecutive exercises of carrying 50 pounds with his left arm, claimant rated his perception of this weight at nine on a ten-point scale, ie., “extremely heavy,” and rated the pain in his left elbow at five on a ten-point scale. ' The FCE concluded that claimant demonstrated the ability to return to work as a mechanic with the noted temporary restriction to avoid the repetitive lifting of more than 35 pounds from the ground.
On April 6, 2011, Dr. Stokes approved claimant’s return to work subject to the restrictions as outlined in the FCE. And on May 9, 2011, after reviewing Paretti’s automotive technician manual, both Dr. Stokes and Dr. Bick determined the job requirements were appropriate for claimant from orthopedic and psychiatric standpoints, respectively.
Yet, during each of the three times claimant returned to work, Mr. Diebold found he performed at no more than 50 percent of his pre-injury capacity. Despite Mr. Diebold’s belief that claimant’s reduced performance, after his initial return, was due to his lack of motivation, there was conflicting testimony on this point. And although Mr. Diebold’s testimony concerned claimant’s performance, as opposed to his wage-earning ability, the evidence established that claimant’s 12nPosition is compensated based on commission such that his wages are earned in direct proportion to the amount and type of work performed. Indeed, claimant testified that the “heavier” jobs, such as “head work”[8] and differentials, are the most lucrative — neither of which he claimed he was physically able to perform.
Moreover, claimant informed Mr. Diaz that there are various tasks which require him to contort his left arm in such a manner that it causes significant pain and prevents him from performing his job duties. He explained that this even occurs when he is not lifting an object over fifty pounds. Claimant reiterated this at trial, testifying that he was still “[un]able to perform [his] job up to what [he] was really expected to do,” struggling to lift objects over thirty pounds. He also acknowledged that he received assistance from his co-workers “maybe half the time.”
In addition to his physical limitations, claimant suffered from depression and anxiety, which Dr. Bick found were caused by claimant’s injury and his resultant *1277 physical inability to work and earn his pre-injury wages. Claimant’s depression and anxiety worsened, which Dr. Bick opined was a result of the September 2009 accident and the work environment. Dr. Bick recognized the possibility that claimant’s depression could cause him to misperceive workshop jocularity as hostility. Accordingly, in September of 2011, finding claimant’s psychiatric state compelled his removal from the work environment, Dr. Bick ordered him to cease working with Paretti.
After leaving the employ of Paretti in September 2011, the evidence established that claimant and Mr. Diaz searched for job opportunities consistent with claimant’s educational, vocational, and physical abilities, as well as within his geographical area. Mr. Diaz first identified a full-time position fitting these parameters on November 30, 2011. The position was an automobile and light |⅞1 truck mechanic at Leson Chevrolet in Harvey, Louisiana, which paid a wage of $30.00 per hour. This position required “medium” level strength such that a mechanic lifts fifty pounds “occasionally,” twenty-five pounds “frequently,” and ten pounds “continuously.” [9] Dr. Stokes approved this position on December 1, 2011, after which Mr. Diaz confirmed that it was still available. Mr. Diaz subsequently identified many other similar full-time positions approved by Dr. Stokes. Claimant testified that he applied for all of the jobs located by Mr. Diaz, as well as jobs he located himself, but was not hired for any positions.
As the foregoing demonstrates, there was varying and conflicting evidence regarding whether and to what extent claimant’s work-related injury limited his ability to perform his job. Bearing in mind that the fact-finder’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review where conflicting evidence exists, and cognizant that workers’ compensation law must be construed liberally in favor of the employee, based on the record before us, we cannot say the WCJ’s resolution of this conflicting evidence in favor of claimant was unreasonable. And, on account of the evidence that claimant was able to perform at no more than 50 percent of his pre-injury capacity, enabling him to earn no more than 50 percent of his pre-injury wages, we find there was a reasonable factual basis supporting the WCJ’s finding that claimant was unable to earn at least 90 percent of his average pre-injury wages. Accordingly, we conclude that the WCJ did not manifestly err in finding claimant upheld his burden of proving by a preponderance of the evidence that he sustained a work-related injury resulting in his inability to earn 90 percent or more of his average pre-injury wages.
The burden of proof then shifted to Paretti to prove, by a preponderance of the evidence, that claimant was physically able to perform a certain job and that the |22job was offered to claimant or that the job was available to claimant in his or the employer’s community or reasonable geographic location. The WCJ’s conclusion that claimant was entitled to SEB from September 13, 2011 until December 1, 2011 was based upon her determination that Paretti upheld this burden, proving that claimant was physically able to perform a certain job that was available to him on December 1, 2011 in his reasonable geographic location. We now consider whether the WCJ manifestly erred in this determination.
*1278 In Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551, 557, the Louisiana Supreme Court clarified the employer’s burden as follows:
[A]n employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence: (1) the existence of a suitable job within claimant’s physical capabilities and within claimant’s or the employer’s community or reasonable geographic region; (2) the amount of wages that an employee with claimant’s experience and training can be expected to earn in that job; and (3) an actual position available for that particular job at the time that the claimant received notification of the job’s existence.
By “suitable job,” we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant’s age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.
Upon review, we find that the Leson Chevrolet position, the first to be identified by Mr. Diaz, satisfied the Banks elements. First, as it is in Harvey, the position is reasonably located within claimant’s geographic region.[10] Second, with a wage of $80.00 per hour, assuming a 40-hour work week, claimant would earn an average of $1,200.00 per week, with average monthly wages of $5,200.00. And third, the record reflects that claimant was notified of this position on November 30, 2011, and the position was confirmed to still be available following Dr. Stokes’ approval on December 1, 2011. Furthermore, despite claimant’s testimony that he | ^applied for but was not hired for this position, the jurisprudence holds that actual job placement, or even an offer of employment, is not necessary to prove the availability of employment. See Banks, 696 So.2d at 556; White v. Cnty. Mkt., 44,699 (La.App. 2 Cir. 9/23/09), 24 So.3d 905, 909.
As regards the position’s “suitability” for claimant’s physical capabilities, we note there was varying evidence on this point. In December of 2010, Dr. Stokes released claimant to limited duty and restricted him to lifting no more than fifty pounds. Claimant’s second FCE in March of 2011 determined that he demonstrated strength in the medium level category in accordance with the classification of the Leson Chevrolet position. The FCE also recommended a temporary restriction to avoid the repetitive lifting of more than 35 pounds from the ground. In April of 2011, Dr. Stokes approved the FCE’s restrictions. Claimant himself testified that he was not comfortable with the fifty-pound limit since he experienced difficulty lifting objects heavier than thirty pounds. The evidence established that the physical demands of the Leson Chevrolet position require mechanics to lift between twenty-five and fifty pounds, with the further specification that they typically lift fifty pounds between 6 and 33 percent of the time, twenty-five pounds between 34 and 66 percent of the time, and ten pounds between 67 and 100 percent of the time.
In view of this evidence, where most of the position’s physical demands comply with Dr. Stokes’ restriction, the FCE’s restriction, and claimant’s own restriction, we find there was a reasonable factual basis for the WCJ’s conclusion that the physical demands of the Leson Chevrolet *1279 position were suitable for claimant’s physical capabilities. We also find that because this job was available, with medical approval, on December 1, 2011, the WCJ did not manifestly err in concluding that claimant was not entitled to SEB beyond that date. There is no evidence that claimant was physically able to perform a job that was offered to him l^or was available to him in his or the employer’s community or reasonable geographic location between September 13, 2011 and December 1, 2011. Yet, the evidence established that such a job became available on December 1, 2011. As a result, we find Paretti satisfied its burden and defeated claimant’s entitlement to SEB beyond that date. Therefore, we conclude that the WCJ did not commit manifest error in finding Paretti proved, by a preponderance of the evidence, that claimant was physically able to perform a job available to claimant in his reasonable geographic location. Both Par-etti’s and claimant’s assignments of error on this issue are without merit.

SEB Computational Error

Upon review, we note a computational error in the trial court’s calculation of claimant’s monthly SEB compensation. The WCJ concluded claimant’s monthly SEB compensation was $1,455.70.[11] A review of the May 17, 2013 judgment does not specify how this figure was calculated, yet claimant’s brief to this Court demonstrates that this figure was arrived at utilizing average monthly pre-injury wages of $4,373.10. It seems that this figure was miscalculated, and thus the resulting monthly SEB compensation was also miscalculated. It is apparent that $4,373.10 was derived by first dividing 52 by 12, which yields 4.338 (4½), rounding this quotient down to 4.3, and then multiplying this by claimant’s average weekly pre-injury wages of $1,017.00. This is a misapplication of the provision which provides that “[ajverage monthly wages shall be computed by multiplying [the employee’s] wages by fifty-two and then dividing the product by twelve.” In accordance with this formula, we find that claimant’s average monthly pre-injury wages were $4,407.00.u Then, to calculate monthly SEB compensation, La. R.S. 23:1221(3)(a)(i) provides that SEB monthly compensation is “equal to sixty-six and two-thirds percent of the difference between the average monthly wages at Intime of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment....” The evidence established that claimant was able to earn 50 percent of his pre-injury wages after his injury. Therefore, with average monthly post-injury wages of $2,203.50 (50 percent of $4,407.00), claimant’s monthly payment of SEB amounts to 66 percent of $2,203.50, or $1,469.00. In light of the WCJ’s conclusion that claimant’s monthly SEB compensation was $1,455.70, we find the WCJ manifestly erred in her calculation of claimant’s monthly SEB. Therefore, the WCJ’s decision awarding claimant SEB compensation at $1,455.70 per month is amended to set claimant’s SEB compensation at $1,469.00 per month. See Dyer v. Gab Bus. Servs., 613 So.2d 801, 805-06 (La.App. 4 Cir.1993), writ denied, 617 So.2d 939 (La.1993).

PARETTI’S ASSIGNMENT OF ERROR NUMBER FOUR

In its fourth assignment of error, Paretti contends that the WCJ erred in finding claimant’s earning capacity is calculated at 50 percent of his pre-injury wages. Paretti argues that the WCJ erred in relying on Mr. Diebold’s testimony that claimant operated at 50 percent capacity after his injury. Paretti contends *1280 this was erroneous because Mr. Diebold’s testimony concerned claimant’s performance, not his ability, which Paretti claims was higher than 90 percent on account of Mr. Diebold’s testimony that claimant was unmotivated.
As pointed out by claimant in his brief, there was conflicting testimony regarding claimant’s motivation. Despite Mr. Die-bold’s testimony that claimant was unmotivated, Mr. Lacoste found claimant put forth good effort and was trying. And Mr. Diaz found claimant possessed a positive attitude about returning to work, that he was cooperative, and that he was well-motivated. Also, since claimant was paid by Paretti on a commission basis (ie., based on the amount of work he actually performed), rather than strictly hourly, it is apparent that this would have 12(;motivated claimant to work as much as possible in order to earn as much as possible. Furthermore, the evidence supports the reasonable inference that claimant was somewhat physically limited by his injury. Thus, in light of the conflicting testimony regarding claimant’s motivation, the evidence that claimant was somewhat physically limited by his injury, and Mr. Die-bold’s testimony that claimant performed, and thus earned wages, at 50 percent of his pre-injury capacity, we find there was a reasonable factual basis for the WCJ’s determination that claimant’s earning capacity was to be calculated at 50 percent of his pre-injury wages. The WCJ did not manifestly err in this determination. This assignment of error is without merit.

PARETTFS ASSIGNMENT OF ERROR NUMBER FIVE

In its fifth assignment of error, Paretti argues that the WCJ erred in holding that claimant is entitled to temporary total disability benefits from- September 9, 2009 through September 12, 2011, for any time period that he was not working. Paretti asserts, and claimant agrees, that claimant has been paid all temporary total disability benefits for that time period. Since both parties agree there is no issue regarding temporary total disability benefits, Paretti requests the WCJ’s holding that claimant is entitled to them be stricken from the WCJ’s ruling. We decline this request. This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, the WCJ’s decision under review is amended to award claimant SEB compensation in the amount of $1,469.00 per month. In all other respects, the WCJ’s decision is affirmed.

AMENDED AND AFFIRMED.

. Claimant's wife is the general manager of Dr. Ehlenberger’s clinic. On account of this, claimant often obtained various treatments from Dr. Ehlenberger, free of charge. For instance, claimant frequently obtained B12 injections from Dr. Ehlenberger to boost his energy.

. The record indicates that claimant was paid a wage of $20.00 per hour by Paretti.

. In its brief, Paretti lists six assignments of error; however, in the arguments section of its brief, Paretti only argues five assignments. In accordance with Rule 2 — 12.4(B)(4) of the Uniform Rules-Courts of Appeal, we will address only those assignments of error that have been argued by Paretti.

. A "mental/mental” injury refers to a "mental injury caused by mental stress.” See La. R.S. 23:1021(8)(b). This provision provides: Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.

. Both parties stipulated to this at trial.

. La. R.S. 23:1221(3)(a)(i) provides that "[a]v-erage monthly wages shall be computed by multiplying [the employee's] wages by fifty-two and then dividing the product by twelve.” La. R.S. 23:1021(13) defines “wages” as “average weekly wages.” Hence, ($1,017.00 x 52)/12 = $4,407.00.

.This figure is 90 percent of $4,407.00.

. “Head work” evidently refers to work on engine heads.

. These terms of frequency correspond to percentages of time per day, such that "occasionally” encompasses 6% to 33%, "frequently” encompasses 34% to 66%, and "continuously” encompasses 67% to 100%.

. Claimant resides in LaPlace, La., which is in St. John the Baptist Parish. The record indicates that Paretti’s place of business is located in Metairie, La., which is in Jefferson Parish, two parishes down-river from claimant’s residence. Harvey, La. is also in Jefferson Parish, across the Mississippi River from Metairie.

. See note 6, supra.